**UNITED STATES of America,**
**Plaintiff–Respondent,**

v.

**Timothy James MCVEIGH,**
**Defendant–Movant.**

**Nos. 00–M494, 96–CR–68–M.**

United States District Court,
D. Colorado.

Oct. 12, 2000.

Dennis W. Hartley, Dennis W. Hartley, P.C., Colorado Springs, CO, for Timothy McVeigh.

Sean Connelly, United States Attorney's Office, Criminal Division, Denver, CO, for U.S.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

Timothy McVeigh filed a Motion to Vacate Conviction and Sentence and for New Trial on March 6, 2000. The motion to vacate conviction and sentence is under 28 U.S.C. § 2255 and the motion for new trial is under Rule 33 of the Federal Rules of Criminal Procedure. The claims under § 2255 are (1) that Mr. McVeigh's lead trial counsel, Stephen Jones, had conflicts of interest preventing him from providing effective assistance of counsel in violation of the Sixth Amendment; (2) that defendant's counsel did not provide effective representation as required by the Sixth Amendment; (3) that the defendant was denied a fair and impartial jury because the jurors gave dishonest answers during *voir dire* questioning and (4) that the defendant was denied due process because the government withheld evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The motion for new trial for newly discovered evidence is based upon the material which the defendant says the government improperly withheld.

The government's answer and brief, filed March 31, 2000, challenges the sufficiency of the motions and urges the court to deny them without an evidentiary hearing. The defendant's reply argues that his allegations are sufficient to warrant an evidentiary hearing.

A motion for post conviction relief under § 2255 is a form of habeas corpus requiring a review of the files and records in the case. The statute provides that unless the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief, the court must grant a prompt hearing and determine the issues by findings of fact and conclusions of law. At the oral argument on August 17, 2000, defendant's counsel argued that the § 2255 motion can be dismissed without an evidentiary hearing only under the standard for dismissal of a complaint for failure to state a claim upon which relief can be granted assuming all of the well pleaded facts to be true as provided by Fed. R.Civ.P. 12(b)(6).

The Rules of Civil Procedure are not directly applicable to these proceedings. The Supreme Court promulgated special rules for § 2255 motions. Rule 2(b) of those rules differs from the notice pleading permitted by Fed.R.Civ.P. 8 in that the motion must "set forth in summary form the facts supporting each of the grounds" relied upon for relief and special Rule 8(a) provides that "[I]f it appears that an evidentiary hearing is not required, the judge shall make such disposition of the motion as justice dictates." Rules Governing Section 2255 Proceedings, Rules 2 and 8.

Guided by the papers filed and the arguments of counsel, the court has reviewed the pertinent parts of the files and records of the criminal case and concludes an evidentiary hearing is not required because none of the grounds relied upon is sufficient to support an order vacating the conviction and sentence. That conclusion results from the following findings and conclusions based upon the existing record. Some of the relevant record is contained in transcripts of non-public proceedings which the court ordered kept under seal. Because this is an adjudicative ruling, the quotations from sealed transcripts in this Memorandum Opinion and Order are now made public.

The trial record of this case and the evidence supporting the jury's verdicts as to guilt and sentence have been succinctly summarized by the Tenth Circuit Court of Appeals in its opinion affirming the conviction and sentence found at *United States v. McVeigh,* 153 F.3d 1166, 1176–1179 (10th Cir.1998), *cert. denied,* 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999).

Chief Judge David Russell in the Western District of Oklahoma appointed Stephen D. Jones as counsel to represent Timothy McVeigh. Shortly thereafter, Chief Judge Russell appointed Richard Burr and Robert Nigh, Jr., as additional counsel. As the case progressed, additional counsel, to the total of 17, were appointed because of the unusual burdens attendant upon investigation, trial preparation and presentation of the defense at the trial. Robert Wyatt, Mr. Jones' law partner, was one of those appointed. The only lawyer now charged with having conflicts of interest is Mr. Jones.

The principal guidance for determining whether a conflict of interest results in a violation of the Sixth Amendment rights of an accused has been provided by the Supreme Court in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *Holloway* held a conviction constitutionally invalid because the trial court rejected a pretrial motion for the appointment of separate counsel for three co-defendants when the lawyer representing all three of them advised the court that one or more of the defendants wished to testify. The attorney-client privilege would prevent counsel from cross examining the testifying defendant on behalf of co-defendants. Additionally, a confession from one of the defendants was to be offered in evidence. During the trial, counsel advised the court that all three defendants wanted to testify. The court again refused separate appointments. The Supreme Court concluded that the failure of the trial judge either to appoint separate counsel or to take adequate steps to determine that the risk of conflict was too remote to warrant separate counsel resulted in a violation of the Sixth Amendment. The Court expressly said that prejudice was presumed and need not be proved under these circumstances.

Mr. McVeigh contends that this court committed the same reversible error by failing to make an inquiry into possible conflicts between Mr. Jones' personal interests and Mr. Jones' duty to zealously represent Mr. McVeigh at trial. On March 12, 1997, Mr. McVeigh placed a telephone call to the court clerk's office inquiring whether the court agreed to meet with him. Mr. McVeigh's new counsel contend that the court was obligated to grant the defendant's request or at least appoint independent counsel to consult with Mr. McVeigh. That claim is rejected because in the full context of the circumstances known to the court, the request did not constitute an objection based upon a conflict of interest and, therefore, does not come within the ruling in *Holloway*. Moreover, Mr. McVeigh had other opportunities to object to Mr. Jones' representation before the trial began.

The pervasive publicity about the events giving rise to this prosecution and these criminal proceedings has been previously summarized in the opinion supporting an order for change of venue. *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1996). The court granted a severance of trials of the two defendants because of differences in the evidence. *United States v. McVeigh*, 169 F.R.D. 362 (D.Colo.1996). The publicity, the complexity of the trial and the government's pursuit of the death penalty required the court to take unusual steps for jury selection. One thousand summons for jury service were issued with a brief questionnaire to be answered by each person summoned for jury service in Mr. McVeigh's trial. The court held closed conferences with counsel for the parties to draft a lengthy questionnaire to be submitted to the summoned jurors at a building away from the courthouse on March 19, 1997.

On February 28, 1997, before final determination of the questions to be on the questionnaire, Mr. Jones and Richard Burr submitted papers seeking a court order to restrain the *Dallas Morning News* from publication of a story that it had put on the Internet on February 27. Mr. Jones and Mr. Burr appeared in chambers with United States Attorney

Patrick Ryan and Special Attorney to the U.S. Attorney General Larry A. Mackey and Mr. Neureiter, one of the attorneys representing the co-defendant Terry Nichols. Mr. Jones reported a telephone call from a reporter for that newspaper saying that he had received "confidential defense documents from a defense staff member" regarding statements reportedly made by Mr. McVeigh to his lawyers. After the court cautioned that an effort to restrain publication by a newspaper might have adverse effects on the trial proceedings, Mr. McVeigh's attorneys decided not to seek such a restraining order.

On March 4, 1997, at the request of defense counsel, the court convened a hearing in chambers, attended by government attorneys Patrick Ryan, Sean Connelly, Larry Mackey, Beth Wilkinson, Scott Mendeloff, Jamie Ornstein and Aitan Goelman, and by Stephen Jones, Robert Nigh, Richard Burr, Amber McLaughlin, Jeralyn Merritt, Mandy Welch, Cheryl Ramsey and Christopher Tritico, trial attorneys for Mr. McVeigh. Mr. Jones advised government counsel and the court that the defense team of lawyers was considering filing a motion for continuance of the trial because of the pretrial publicity and had talked to Mr. McVeigh about it. After the court said that the jury selection process would be the best way to determine whether a continuance was necessary, Mr. Jones made the following statements:

MR. JONES: Well, in the spirit—in the same spirit of candor that the Court has addressed the issue, let me tell you that it was our considered opinion yesterday afternoon that we should ask for a continuance; and I hope I'm not going to say anything here that anybody would constitute as a waiver; but we went out to Mr. McVeigh and talked to him about it, and he said almost word for word what you said. That was almost exactly his analysis.

So we talked about it for a little bit and—but he said he would sleep on it overnight.

So we went back out to see him this morning after we had done some research; and what we've kind of got here, as I see it, is we've got the press establishment, on one hand, saying they have the right to report the news; and we've got the criminal defense bar establishment, on the other hand, saying, Oh, my gosh, we need a continuance. So once again, the press and the bar clash; but our job is to serve our client's wishes.

We presented to him all of the facts as we understand them and believe them concerning *The Dallas Morning News'* acquisition of the documents. We told him that if he wanted to petition the Court for a change of lawyers that he was free to do that; if he wanted to talk with the Court privately, we thought the Court would permit that.

He was told he could request a continuance; that it would be up to the Court. We discussed the pros and cons of filing a motion for continuance and it being denied and saving the issue for appeal. We discussed each and every issue that I could think of that bore on this matter yesterday and today.

Mr. Nigh went out to see him this morning, took him a memorandum from me which—did he read that?

MR. NIGH: He did.

MR. JONES: Yeah. And after he talked with Mr. Nigh, he called me; so he said he had given it careful thought; that he did not want a continuance, did not want to change lawyers, it was not necessary to speak with you, although if—he understood that you might want something on the record from him, and that would be fine, and he'd be available, he was sure, and if you wanted to join him in a conference call, that would be fine. He wasn't seeking that.

He did have two suggestions, one of which had not occurred to us, and the other one had; and that was that he hoped that we would be permitted to *voir dire* the jury carefully on this sub-

ject and to whatever extent the Court felt it would be appropriate.

I told him I was quite confident the Court would permit that, and he asked us to consider not—and I got it a little wrong this morning in speaking with Mr. Manspeaker—not to pull back this thousand but would the Court consider sending out another thousand summonses just to kind of dilute.

I told him I didn't know what the timetable or mechanics would be, if that could be done, but I would certainly present it to the Court.

Otherwise, he said full steam ahead. He wasn't laying behind the log, wasn't trying to—I told him about 2255 and all of that; and he said no, he said I've thought about it carefully and I appreciate everything you've said and I've listened to the radio and that's my opinion.

So that's his opinion.

And Mr. Nigh was there this morning, if he can—he may wish to speak to that.

MR. NIGH: I would add, your Honor, the reason for the request to supplement the summonses with an additional number of summonses is that these 1,000 summonses went out to these potential jurors prior to the time that this story hit. And the chances are that those people may have become focused upon publicity that may occur concerning the case, and they may have been paying much more attention to the publicity than the population at large.

If we did additional summonses, we could certainly gauge that effect on whether the focus created a difference in the perceptions and whether or not we're going to be better able to seat a fair jury by use of people that did not receive a summons prior to the time this story hit.

Tr. of Proceedings on March 4, 1997, pp. 7–10.

In the course of the conference the following colloquy took place between the court and Mr. Mackey:

MR. MACKEY: Judge, may I go back to one thing Mr. Jones raised earlier, alluded to? And that is the current state of satisfaction of Mr. McVeigh with representation by Mr. Jones and his team. And our only request at this point in time—and maybe the Court already had that in mind—is at some point do an individual judicial inquiry of Mr. McVeigh to satisfactory [sic] the record and the Court that there is nothing about the events of the last three, four, five days that shakes his confidence or raises any concern on his part as to satisfaction with Counsel.

THE COURT: Well, I haven't planned to do that, because I don't want to suggest anything to him. It seems to me that when you—I do something like that and address an accused, it could reasonably be interpreted by a non-lawyer that I was suggesting that I believed there was something improper or unethical or inappropriate or ineffective in the representation being provided.

I don't intend to give that message to Mr. McVeigh, . . .

*Id.* at pp. 20–21.

On March 7, 1997, the court convened a chambers conference to discuss the notice to the jury panel for their appearance on March 19 to answer the written questionnaire. Attending were Mr. Ryan, Mr. Hartzler, Mr. Connelly, Mr. Mackey and Ms. Wilkinson for the government and Mr. Nigh, Mr. Burr, Ms. Merritt and Randall Coyne as counsel for Mr. McVeigh. After the court reviewed the questionnaire and discussed the procedures to be followed in submitting it to the prospective jurors, Mr. Burr informed the court that new developments may require a motion for continuance, principally legislation pending before the U.S. Congress regarding the right of victim witnesses to be present during the trial. The following colloquy then occurred:

MR. BURR: We anticipate—and obviously, we don't know; but we anticipate in connection with that a fair amount of publicity that may in fact recycle some of the most inflammatory

information or stories that have come out in the last week. We are worried about that.

We have not said anything about those stories since Tuesday. There was a *Rocky Mountain News* editorial yesterday that was quite condemning and scathing about Mr. McVeigh's counsel. There are *Newsweek* and *Time* articles that have come on the stand since Tuesday, one of which shows a picture of Mr. McVeigh with the words by him, as if he had confessed to the murder—the bombing.

We are concerned about these new matters.

THE COURT: Well, I can understand that; but what Mr. Ryan has just said somewhat in jest is the controlling thing in my mind; and that is the longer this case is delayed, the more that stuff comes up. And the best thing from the standpoint of a fair trial is to get this case tried.

MR. BURR: Your Honor, we respectfully may disagree with that.

THE COURT: Well, certainly that's your right.

MR. BURR: If so, we will file a motion by Monday.

THE COURT: But if you file motions, you can expect a very quick hearing, so that we don't have doubt out there.

Tr. of Proceedings on March 7, 1997, p. 56.

At their request, Mr. Jones and Mr. Wyatt met with the court, *ex parte*, in the morning of March 12, 1997, to report that there was a new story on the Internet from *Playboy* magazine about inculpatory statements allegedly made by Mr. McVeigh to his lawyers. Mr. Jones said that he wanted to give advance notice that the defense intended to file a motion for continuance because of this story while assuring the court that the defense would be ready to proceed if the court denied the motion. The following colloquy then took place between the court and Mr. Jones:

THE COURT: What can you tell me about Mr. McVeigh's confidence in you?

I don't want to interfere with the privilege; but, you know, it was mentioned, I think, by Mr. Ryan or someone last week that perhaps I should ask Mr. McVeigh if he continues to have confidence.

The most disturbing part of these stories is to suggest that they came from someone on the defense team; and I—as I responded last week, I don't want to plant some uncertainty in Mr. McVeigh's mind that I have lost confidence in his counsel.

MR. JONES: Well, I think to answer the question fully, as the circumstances I think justify, and bearing in mind that I'm court-appointed and subject to the Court's authority and including removal and those matters that I should speak to that candidly, knowing—and I believe this—that whatever I may say—and I'll be cautious in what I say—will not impact upon whatever exercise of discretion the Court has. I've watched the Court, and I'm satisfied that that's not a problem.

I would say that clearly, Mr. McVeigh would be less than normal if this hasn't troubled him, shaken him. When the first *Dallas Morning News* story appeared, he told the barber to cut his hair short. That was an act of defiance. Well, perhaps "defiance" is a poor choice of words. It was an act of frustration and rebellion, but obviously not very high.

This morning when I went and spoke with him, he indicated that—and he had told us last night that he wanted to speak with the Court privately. I said, "Tim, this is the trial judge." I mean the problem with that, without my telling him at least the subject matter, is that he doesn't want to be in a situation where you make some statement to him that could conceivably make him a witness or disqualify him or something like that.

"I think the Court would be very cautious in meeting with you without me

being present, even if you want to say that you don't have confidence in me. I mean, obviously that's not going to be kept secret very long, if that's what you want to talk to him about.

"If you want to talk to him about a change of plea, that's even more tricky"; and I said I'm—"I just think that the Judge is going to be uncomfortable. That doesn't mean he's not going to do it. I will tell him that that's what you want. And I am telling you—" and Mr. Wyatt is here if I misstated or leave something out—I said, "He may simply want to do it by telephone. He may feel to bring you downtown may draw undue attention to it."

I said, "Can you tell me at least the subject?"

He said, "Well, I would like to get some legal advice."

And I said, "Well, that's even trickier." I said, "Now, I recognize that what you call legal advice may not really be legal advice; but it is tricky."

I spent about an hour with him, went over everything, explained the circumstances in detail and told him the legal ramifications of this, both the positive and negatives.

And he didn't elucidate any further as to what he wanted to speak with the Court about.

I told him I would call the Court when we left and communicate his wishes to the Court.

\*     \*     \*     \*     \*     \*

THE COURT: As of now, does he still want to meet with me?

MR. JONES: He did this morning, yes.

THE COURT: And you told him that you would pass that on?

MR. JONES: I did.

THE COURT: I don't see how I can do that, meet with him without you, for all the reasons that I expect you've already told him. And given what you've just related concerning the working relationship that you have with him, it seems to me not necessary for me to meet with him for purposes of protecting the case.

MR. JONES: And it may be that all he wants is to simply be assured he'll be given a fair shake.

\*     \*     \*     \*     \*     \*

THE COURT: The other—well, relay back to Mr. McVeigh that you've made the request and that I've denied it and that I believe it to be inappropriate and I do not want to cause any conversation here to affect my ability to give him a fair trial, and that's the reason for rejecting it.

Tr. of Proceedings on March 12, 1997, 10:45 a.m., pp. 7–9; 12–13.

In the afternoon of March 12, the court on its own initiative met with Mr. Jones, *ex parte*, in chambers, to inform that Mr. McVeigh had made a telephone call to the clerk's office. The deputy clerk reported as follows:

DEPUTY CLERK: He telephoned our office at 6407, and Deborah answered; and she verified or questioned who it was. And he wanted to speak to Mr. Manspeaker. She advised Mr. Manspeaker was out of the office, and he wanted to speak to the next in line; and she gave him my name and asked that I speak to him, and I did.

And he identified himself and advised that the call was being recorded because he was calling from FCI on their social line. This was at 12:03. He said he wanted to know whether his attorney had contacted the Judge or met with the Judge, had a conference with the Judge.

And I advised him that he should probably contact his attorney regarding anything his attorney has or has not done.

He said he understood that; and he said, "Let me rephrase the question." He says, "Has the Judge agreed to meet with me?"

And I says, "I think you ought to contact your attorney for any information regarding that."

And he said something to the effect, "Well, that's the problem. It's regarding my representation."

And I says, "You still need to contact your attorney."

And he said that he would do so and that if he needed anything else he would call us again. And that was it.

Tr. of Proceedings on March 12, 1997, 2:10 p.m., pp. 2–3.

Mr. Jones then advised the court as follows:

MR. JONES: I have some additional information for you, if I may; and I don't think there is any problem in my relating this to you.

I went back to the office and I asked all the lawyers to come in and the office manager and our note-taker, Ms. Bradley. And I informed the group about the conversation with Mr. McVeigh this morning, and then I informed them in detail concerning my conversation with you.

Various suggestions were made: Had I suggested to the Court that perhaps he send the public defender to talk to Mr. McVeigh, or this or that? Named a couple of other people that I didn't catch their name, but I'm sure the Court would know.

And I said no, I had not suggested that; that the Court had been a judge for almost a quarter of a century and that I didn't think that those suggestions had gone absent from the Court's mind, aside from the fact there would be questions of privilege and that the Court had the regular order. And so there was some discussion back and forth about that and discussion concerning the continuance motion. And we took a show of hands to get a consensus on what we should do.

When we finished, I admonished—I shouldn't say admonished—I told them that I thought it was important that we remember what our duty was; that the Court expected a certain level of performance from us and that your behavior during a crisis, the only thing you have—or during a crisis, the only thing you have after it is your behavior and that we should get back to work and prepare the case for trial. And that's where we left it.

Then a little while after that, maybe ten minutes, Tim called. And I had told the secretary that he should be put through to me first and then if he wanted to talk to anybody else.

So he was put through to me and he asked me if I had conveyed to you his desire; and I said, "Absolutely." I said, "I didn't even return to the office. I called the judge and took Bob Wyatt with me, and there is a full record of it. And I told him in as much precise detail, sometimes even using word for word what you said."

And he said, "What did the judge say?"

And I said, "Well, I think that the judge is uncomfortable meeting with you today. He has declined your request. I'm sure that he will keep it under advisement and think about it. And there probably will be a hearing on a motion for continuance, and he may address it then."

And I said, "Tim, I think the thing to do—this is an unprecedented case, and you just have to kind of sit and wait on developments."

After he hung up—he said, "Well, that's all I want to know," and hung up; and he was civil.

I then called Tina Rowe; and I said, "Listen, I don't mean to alarm you, and I'm not calling to alarm you; but," I said, "Tim asked to see the Court. That's an awkward situation for everyone. And I know you're a law enforcement officer; but by the same token, you've impressed me with your professionalism. Perhaps you might want to just check and be sure that there is no destructive behavior going on. I'm sure there is not; but in an abundance of caution, I just advise you. I think that's my duty."

She said, well, of course she would go out right then.

And I said, "Don't Mirandize him, just—"

She said, "Oh, no, you don't have to worry about that. You know better. You know not to worry about that."

I said, "I know you, but," I said "I know you and the Court knows you and you're a court officer, so just as a check."

Then about 20 or 30 minutes later, Jeri Merritt, who was in the office—secretary called and said that Tim was trying to reach her and wanted to talk with her.

Well, I'm very fond of Jeri; but the truth of the matter is that that's Tim's least favorite lawyer for reasons that have nothing to do with her ability. And so I said, "Well, Jeri, if he calls, call him and tell him you're up here and he should call you and speak to you. There isn't anything wrong with that."

Before I came here, Jeri called and said she was talking with Tim and said Tim does want to talk to the Judge about changing counsel; and he wants the judge just to leave Dick, Randy, and Mandy in and maybe me and maybe Rob Nigh.

I said, "I will convey that to the judge."

THE COURT: Where we are right now.

MR. JONES: Which is where we are right now.

THE COURT: Well, I don't intend to take any action on this request now, do anything different from what we discussed this morning. After you file your motion, then I may decide what to do. He'll be here on any hearing that we have on the motion, whether it's in open court, in chambers, or a combination; and I'll decide then.

Obviously, one of the options would be to give him yet another lawyer to simply discuss this issue, but I'm very reluctant to do that.

I think that that's putting that other lawyer, whoever it might be, in a very difficult situation and also putting you in a difficult situation.

MR. JONES: Yes. I don't think I should comment on this, unless the Court invites comment; so if you want to hear my views sometime, I'll be glad to give them; otherwise, I'll wait till you advise me further.

Meantime, until or if such time as the Court takes action, I consider myself his principal lawyer; and I will continue to prepare for trial, which is now set for the 31st.

THE COURT: Yes. That's your role. *Id.* at pp. 4–8.

On March 14, 1997, the court met with counsel to finalize the questionnaire to be submitted to the jury panel on March 19. The government appeared by Patrick M. Ryan and by Joseph Hartzler, Sean Connelly, Larry Mackey, Beth Wilkinson, Jamie Ornstein and Vicki Behenna. Representing Mr. McVeigh were Stephen Jones, Robert Nigh, Richard Burr, Amber McLaughlin, Jeralyn Merritt, Cheryl Ramsey and Christopher Tritico. Mr. Burr was the active participant for Mr. McVeigh in discussing the questionnaire and *voir dire* procedures. At the conclusion of that discussion Mr. Jones advised the court that the defense had filed a pleading designated "Motion to Dismiss or in the Alternative, Request for Abatement" asking the court to delay the trial for at least one year because of the publicity surrounding the articles from the *Dallas Morning News* and *Playboy.* Mr. Connelly advised that the government had already filed its response to the motion. Mr. Jones then made the following statement to the court:

There are some affidavits attached, and I don't want to foreclose the Government's right to file counter-affidavits; but we are certainly willing for the Court to consider this on the papers, rather than oral argument. And if the Court wishes to announce whatever its decision is in chambers or in public or

by written order, as the Court thinks best, is fine. If the Court wants to hear brief argument, we'll be prepared to do that.

I also want to assure the Court that in the event the Court should in the exercise of its discretion deny it, we will be prepared to commence on the 31st day of March under the Court's Scheduling Order No. 6.

Tr. of Proceedings on March 14, 1997, p. 25.

The motion to dismiss or for abatement was denied by an order of March 17 published as *United States v. McVeigh,* 955 F.Supp. 1281 (D.Colo.1997). There the court reviewed the extraordinary procedures being followed to assure fundamental fairness in preparation for trial and concluded:

> The two published stories and the publicity surrounding them must be considered in the full context of all that has been said and done in connection with this case. There is no reason to believe that fair-minded persons would be so influenced by anything contained in this recent publicity that they would not be ready, willing and able to perform the duty to follow the law and decide according to the evidence presented in a vigorously contested trial.

> A salient virtue of a free people in an open society is a healthy skepticism about what they are told. We have a strong tradition of civic responsibility and the great majority of our citizens consistently display a respect for fair play in all aspects of their lives. The extensive voir dire to be conducted in this case will determine whether the persons summoned from 23 counties in Colorado include at least 18 people who can serve as jurors and alternates in the forthcoming trial. I have full confidence that a fair minded jury can and will be empaneled and that those selected will return a just verdict based on the law and evidence presented to them.

*Id.* at 1283.

The court met with all of the jury panel members at a remote location on March 19, 1997, as scheduled, and the panel members completed the questionnaires in the presence of the court. On the morning of March 21, 1997, the court met with counsel for the parties to discuss the application of newly enacted legislation entitled Victims' Rights Clarification Act of 1997 directing that victims be exempt from a sequestration of witnesses order. Mr. McVeigh was represented at that hearing by Stephen Jones, Robert Nigh, Richard Burr, Randall Coyne, Jeralyn Merritt and Christopher Tritico.

A second conference with counsel was convened in the afternoon of March 21, 1997, to discuss the scope of oral *voir dire* questions. The same attorneys appeared for Mr. McVeigh. Mr. Burr spoke for Mr. McVeigh in the discussion of the manner in which the death penalty would be considered in *voir dire.* Through the use of a computer, the court established a randomized order in which prospective jurors would be called in for oral *voir dire.* Copies of their completed questionnaires were given to counsel.

The court met with counsel to review the completed questionnaires to determine whether any of the prospective jurors should be excused for cause based on their written answers. The first of these conferences was convened on March 25. The government was represented by its trial team of seven lawyers and Mr. McVeigh was represented by Stephen Jones, Richard Burr, Cheryl Ramsey and Christopher Tritico. Mr. Burr took the lead for the defense in this discussion. At the conclusion of the discussion regarding the questionnaires, Mr. Jones informed the court as follows:

> MR. JONES: Secondly, to give the Court a head-up—and I thought we might get it over here before we broke, but we made faster time than we

thought. Now that we've analyzed these questionnaires and the responses to them, the answers given by the folks, we're filing another motion for continuance in order to preserve the record. And we'll have it on file this afternoon, of course serve a copy on the Government. I was hoping we'd get it here before we broke, just so the Court could do whatever it wanted to do with it today; but you might want to stay it.

THE COURT: What are you saying in it?

MR. JONES: Well, to be frank, Judge, our view of the answers to the responses are different than the Court's view. And I suppose they're the mirror side of Mr. Ryan's view. We find that about 60, 65 percent of these people either fall into one of two categories, and we've got the exact statistics in the motion. But either they know about *The Dallas Morning News* and *Playboy* and either give—and give details, or they have already a fixed opinion.

And a substantial number of them didn't follow the Court's instructions, because the notices were mailed out on the 14th or thereabouts; most of them got them around the 17th or 18th. *The Dallas Morning News* controversy appeared on the evening of February 28 and many of these people show some specific familiarity with it, . . .

Tr. of Proceedings on March 25, 1997, pp. 16–17.

Additionally, Mr. Jones objected on constitutional grounds to the court's order implementing the newly enacted amendment to the Victims' Rights Act.

At a chambers conference on March 27, the court denied the motion for continuance holding that determination of the effect of pretrial publicity must await oral *voir dire*. Mr. McVeigh was represented by Mr. Jones, Ms. Ramsey and Mr. Tritico. Mr. Jones advised the court that he had filed a petition for a writ of prohibition asking the Tenth Circuit Court of Appeals to stop the trial based on the questionnaires and the court's denial of the motion for abatement and the court's ruling on compliance with the Victims' Rights Clarification Act. The Tenth Circuit Court of Appeals denied relief.

Courtroom *voir dire* began as scheduled on March 31, 1997, and proceeded for several weeks. Each prospective juror was questioned by the court and by one attorney for the prosecution and one attorney for the defendant. The court met with counsel for the parties to discuss challenges for cause at in-chambers conferences after each day's recess or before trial resumed on the following morning.

On Tuesday, April 1, the court met with counsel for the parties in chambers at 8:00 a.m. to hear challenges for cause on the jurors questioned on the previous day. Mr. McVeigh was not present. The next such session was on Thursday, April 3 at 5:10 p.m. Mr. McVeigh was present with Stephen Jones, Robert Nigh and Richard Burr. The following colloquy took place before discussion of challenges for cause.

THE COURT: Well, what I wanted to ask about first was Mr. McVeigh wasn't here on Tuesday morning at 8:00 when we did this. Mr. McVeigh is here now. I didn't ask expressly on the record Tuesday, I don't think, Mr. Jones, about whether Mr. McVeigh wanted to be here then.

MR. JONES: I think at that time he didn't, but he would like to be here now; so I don't think we're objecting to his absence on Tuesday.

THE COURT: All right.

MR. JONES: If he wanted to be here, it was our fault—his lawyers' fault for not bringing it to the Court's attention.

THE COURT: Well, you understand, Mr. McVeigh, we did talk about some of these jurors without your being here.

THE DEFENDANT: Yes.

THE COURT: And is that all right with you?

THE DEFENDANT: Yes, your Honor.

THE COURT: And then I expect to talk about some more tomorrow morning at 8:00. Do you want to be here then? You can talk to your lawyers about it. You don't have to answer me right now.

THE DEFENDANT: To be truthful, I just want to get a taste of what went on in here; and if I could hold off on that decision.

THE COURT: It's your right to be here. If you want to be, you can talk to your lawyers and they can tell me in the morning; and of course we need to let the marshals know.

THE DEFENDANT: Thank you.

Trial Tr. pp. 1121–22.

Mr. McVeigh attended the subsequent conferences discussing challenges for cause based on *voir dire.*

Mr. Jones did not attend the April 4 challenges conference. Mr. Nigh, Mr. Burr, Mr. Ramsey and Mr. Tritico appeared with Mr. McVeigh. If Mr. McVeigh was unhappy with Mr. Jones' representation, he and the lawyers with him had the opportunity to raise that objection with the court in Mr. Jones' absence. While the proceedings were formal, all of these conferences were in chambers with counsel, the court and Mr. McVeigh sitting around a large conference table and, as noted from the April 3 transcript, Mr. McVeigh appeared to be at ease in direct communication with the court.

The attempt by Mr. McVeigh to speak with the court by the telephone call to the court's staff on March 12, 1997, does not constitute an objection to representation by Mr. Jones because of a conflict of interest. At best, that effort reflects the unsettling effects of the pretrial publicity surrounding the articles in the *Dallas Morning News* and *Playboy.* Present counsel for Mr. McVeigh say that Ms. Merritt prepared an affidavit for Mr. McVeigh to sign for submission to the court and that Mr. Jones prevented her from doing so. That matter is included in the quoted colloquy from the afternoon conference on March 12, 1997. Whatever was to be said in that affidavit was within the knowledge of Mr. McVeigh and it is not included in his § 2255 motion or the papers supporting it.

The defendant has not made a showing for application of the *Holloway* ruling. It is limited to joint representation of multiple defendants. In such a case, it is apparent that there is an extremely high risk of actual conflict in the course of trial because of differing defenses and the inability to challenge evidence or cross-examine witnesses in the separate interests of each, made most obvious by the decision of one of the defendants to testify in his defense. Indeed, the *Holloway* case led to the 1979 amendment to Rule 44 of the Federal Rules of Criminal Procedure by adding paragraph (c) to that rule requiring that joint representation of two or more defendants be specifically approved by the court after a hearing at which the court must personally advise each defendant of the right to effective assistance of counsel including separate representation and a finding of good cause to believe that no conflict of interest is likely to arise. In *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Court affirmed a conviction and approved the trial court's refusal to permit joint representation, recognizing the conflict between the right of an accused to select counsel and the court's duty to protect against a conflict of interest.

The Supreme Court addressed the effectiveness of representation of counsel in a multiple defendant case upon habeas review of a state court conviction in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In that case, three defendants were charged with the first degree murders of two victims. They were represented by two privately retained lawyers at three separate trials. Sullivan was the first defendant to be brought to trial and he was convicted. The trials of the other two defendants resulted in acquittals. None of the defendants made any pretrial objections to the

multiple representation. The Court distinguished the case from *Holloway* and held that the trial court had no duty to inquire into a possible conflict of interest. The Court went on to rule that "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350, 100 S.Ct. 1708. Holding that the possibility of conflicting interests is insufficient to impugn a conviction, the Court remanded the case for a hearing to determine whether an actual conflict of interest adversely affected the lawyer's performance in the trial.

*Cuyler* was applied by the Tenth Circuit Court of Appeals in *United States v. Bowie,* 892 F.2d 1494, 1500 (10th Cir.1990). The defendant's lawyer had previously represented one of the government's witnesses who made a plea bargain to cooperate. The court remanded the case for an evidentiary hearing to determine whether an actual conflict adversely affected defense counsel's performance. *Id.* at 1502.

There are three different standards for determining when a defendant has been denied the Sixth Amendment right to effective representation by counsel. *Holloway* established the rule that a violation is presumed when the conflict is apparent because the defendant's lawyer is representing one or more co-defendants and a timely objection has brought the court's attention to the conflict inherent in multiple representation. No showing of adverse effects is required. *Selsor v. Kaiser,* 81 F.3d 1492, 1504 (10th Cir.1996). Under *Cuyler,* when no objection is raised at trial, post conviction relief under the Sixth Amendment depends upon proof that the defendant's lawyer actively represented conflicting interests and that the conflict adversely affected the lawyer's performance. All other claims of ineffective assistance of counsel must meet the requirements of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Tenth Circuit cases have made it clear that the Sixth Amendment guarantee of the effective assistance of counsel free from conflicts of interest extends to any circumstances in which there are conflicting duties to the defendant and any third person. *United States v. Cook,* 45 F.3d 388, 393 (10th Cir.1995). In such cases, the defendant must show the existence of an actual conflict of interest. *United States v. Hernandez,* 849 F.2d 1325, 1329 (10th Cir.1988). A complete breakdown in communications between a defendant and his lawyer may be considered a conflict of interest. *Romero v. Furlong,* 215 F.3d 1107, 1113 (10th Cir.2000). To be adverse, the interest must be divergent from the defendant's interest. The Sixth Amendment does not require rapport or a "meaningful relationship" between the defendant and appointed counsel. *Morris v. Slappy,* 461 U.S. 1, 13–14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

Mr. McVeigh has not shown any basis for applying either *Holloway* or *Cuyler.* Assuming that Mr. Jones may have been motivated by a personal desire for notoriety and, perhaps, future financial rewards from writing or speaking about the case after its conclusion, such an interest is not divergent from the defendant's interest in avoiding conviction and a death sentence. The efforts made by Mr. Jones to establish a working relationship with the news media were consistent with the perceived need to humanize his client and counter the vast amount of negative publicity about him. The Supreme Court has recognized the legitimacy of such efforts in *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991), as this court did in this case. *United States v. McVeigh,* 931 F.Supp. 756 (D.Colo.1996).

The court records of the chambers conferences before trial, previously discussed, show that Mr. McVeigh was actively represented at trial by at least six experienced trial lawyers. It is also apparent that Mr. Nigh and Mr. Burr had free access to Mr.

McVeigh. If Mr. McVeigh had in any way communicated to them a concern about a conflict of interest, they had an independent ethical duty to present it to the court. Moreover, each of these lawyers had extensive experience in defending criminal cases and each of them was aware of the pretrial publicity and the circumstances giving rise to the motions for continuance and for abatement. Each of them could independently evaluate whether those circumstances created a disqualifying conflict of interest. None of them made any objection on behalf of Mr. McVeigh on that ground.

Mr. Burr and Mr. Nigh represented Mr. McVeigh in his direct appeal. Mr. Jones was not counsel before the appellate court. Mr. Burr and Mr. Nigh were therefore independently free to raise the question of conflict of interest under both the *Holloway* and *Cuyler* standards on direct appeal and they did not do so.

The actual conflicting interests now being asserted by Mr. McVeigh's habeas lawyers are all rooted in the contention that Mr. Jones was motivated throughout the proceeding by his personal interest in gaining notoriety for himself and for financial reward, both by obtaining fees and by the post-trial publication of a book regarding the case. With respect to the contention that there was a direct financial interest motivating Mr. Jones and the presumed effort to prevent Mr. McVeigh from objecting to continued representation, it must be noted that although very substantial payments went to Mr. Jones and to the other lawyers representing Mr. McVeigh, the hourly rate for lead counsel was $150 and all payments were subject to court approval. Present counsel contend that Mr. Jones was interested in conducting a trial in a manner that would enhance the literary value of a book about his role. Assuming that Mr. Jones planned to write a book after the trial was concluded, as he did, the defendant has not shown how any strategic or tactical decision made in the course of the defense was influenced by such a motivation.

It is suggested that the motions for continuance were made merely *pro forma* and that Mr. Jones undermined those motions by his comments to the court in the chambers conferences previously quoted from the record. No argument, however vigorously made, would have delayed the court's efforts to empanel a jury. The court was prepared to reconsider the motion for a continuance if fair minded jurors could not be found. The court's rulings were affirmed on appeal.

Mr. McVeigh also suggests that there was an actual conflict of interest because Mr. Jones was acquainted with the family of one of the victims of the bombing. The trial record demonstrates that Mr. Jones expressly objected to the implementation of the victims' legislation, objected to the requirement made by Congress that the court transmit the trial to Oklahoma City by closed circuit television and consistently objected to emotional testimony by the victims both in the course of the trial and the sentencing hearing.

■ The *Strickland* standard is applicable to this case. To obtain relief here, Mr. McVeigh must show that the actual trial performance of Mr. Jones, taken in full context with the work of the other lawyers appearing for the defendant at trial, was below an objectively reasonable standard of care and so prejudiced the defense that there is a reasonable probability that the outcome of the trial would have been different either as to conviction or sentence. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

The defendant has contended that the performance of defense counsel at trial was below the standard for effectiveness in this death penalty case. The claims are (1) inadequate *voir dire;* (2) failure to prevent leaks of information to media; and (3) ineffective cross-examination of Michael Fortier. Under the *Strickland* standard, the court can grant relief from the conviction only if it is shown that the conduct of the defense was so far below the applicable standard of care as to undermine confidence in the outcome of the trial. *James*

*v. Gibson,* 211 F.3d 543, 555 (10th Cir. 2000).

The criticism of the defense *voir dire* is related to the defendant's Rule 33 motion because the underlying premise is that the jurors who convicted Timothy McVeigh and recommended a sentence of death were not fair and impartial and violated their oath by giving dishonest answers in responding to the court's questionnaire and during *voir dire* questioning by counsel and the court. The primary focus is on the jurors' willingness to consider a life sentence after finding the defendant guilty of the crimes charged. Mr. McVeigh specifically challenges the adequacy of defense counsel's inquiries of four jurors as to "life qualification" under *Morgan v. Illinois,* 504 U.S. 719, 729–30, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The argument fails to recognize the full context of the participation of defense counsel in the questioning of these jurors on this subject. Each juror answered death penalty questions on the written questionnaire. A total of 109 jury panel members were questioned as to their views and opinions about the penalty phase by the court and defense and government counsel. Two jury consultants were retained by the defense and they were present in the courtroom and available for consultation throughout the jury selection process. Moreover, neither the government nor the defense were required to make challenges for cause until they had transcripts of the examination and an opportunity for full discussion at the in-chambers conferences with the court, as previously described. The parties agreed to the use of all their peremptory challenges to select the jury of 12 with 6 alternate jurors after 64 persons were passed for cause.

Lawyers experienced in the trial of capital cases have widely varying views about addressing the delicate balance between the disqualification of jurors whose personal beliefs prevent them from ever imposing the penalty of death under *Witherspoon v. Illinois,* 391 U.S. 510, 520–23, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and those who would automatically recommend that sentence if they found the defendant guilty. *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). The difficulty of the task is greater where there has been widespread publicity and public comment about the crime, the investigation and pre-trial proceedings, as in this case. Public comments included those made by the President of the United States, the United States Attorney General and the Governor of Oklahoma, among many others. *United States v. McVeigh,* 918 F.Supp. 1467 (W.D.Okla.1996).

The adequacy of *voir dire* was considered by the Tenth Circuit Court of Appeals in the context of the extensive pre-trial publicity. *United States v. McVeigh,* 153 F.3d at 1179–1184, 1205–1211. The reviewing court held that there was no abuse of discretion in the court's determination that the seated jury could and would decide the case in a fair and impartial manner.

On the direct appeal Mr. Burr and Mr. Nigh argued that the court improperly restricted defense counsel's questioning of prospective jurors. Both in pretrial briefs and in the actual *voir dire,* defendant's lawyers sought to inquire about what each juror would think was an appropriate punishment if the government's allegations proved to be true. These are the same types of questions which Mr. McVeigh's present counsel says should have been asked. The appellate court ruled that exclusion of them was not an abuse of discretion.

In presenting these post conviction motions to vacate the sentence and for a new trial, Mr. McVeigh's attorneys want to conduct discovery and to convene an evidentiary hearing to prove that jurors did not give truthful answers on questions relating to the effects of pretrial publicity on them and their willingness to hear and decide with open minds. The public statements made by trial jurors in post-trial interviews broadcast by a news network and a well known nationally televised investigative reporting program are said to cast doubt on the credibility of those jurors.

Mr. McVeigh also says that information obtained by his new defense team concerning tape recorded interviews in the possession of an organization known as the Oklahoma City Bombing Archives Committee would further support this claim.

■ Consideration of statements made by trial jurors after they experienced the entire trial and sentence hearing and after deliberating on the verdicts are not reasonably probative of the honesty of their answers to *voir dire* questions relating to their ability to set aside what they remembered about what they saw and heard before trial, and whether they could consider the evidence with open minds and follow the court's instructions on the law in both phases of trial. Thus, the proffer of proof is not persuasive and the proposed discovery would not likely lead to evidence impeaching their responses. The jurors are not permitted to testify to impeach their verdict under Fed.R.Evid. 606(b).

Mr. McVeigh's present counsel assert that the defense *voir dire* was ineffective because there was no discernible coherent strategy. Mr. McVeigh makes a specific criticism of the *voir dire* examination of Juror No. 162 which began with the court's questions late in the morning of April 17, 1997 with Stephen Jones and Robert Warren appearing with the defendant. After an explanation of the sentencing process and general questions regarding this juror's ability to make a sentencing decision, the court recessed for lunch. When the afternoon session began, Mr. Nigh appeared with Mr. McVeigh and the court informed the prospective juror that Mr. Nigh was replacing Mr. Jones. Mr. Tritico then came into the courtroom, and apologized for being tardy. Mr. Ryan proceeded with the government voir dire. Mr. Tritico then questioned for Mr. McVeigh, first apologizing to the juror for being late, explaining that he had only recently been notified that he would do the *voir dire* for the defense. Mr. Tritico's questioning was consistent with the approach taken by defense counsel with other prospective jurors as to pretrial publici-

ty and the juror's answers to the written questions about the death penalty. The contention now made that Mr. Jones acted inappropriately by leaving the courtroom has no merit. The change of counsel was made with an apology. Mr. Tritico followed up on the answers given to Mr. Ryan's questions and pursued the same lines of questioning used by Mr. Jones and other defense counsel with other panel members.

Mr. McVeigh's lawyers want to call expert witnesses to give their opinions on the adequacy of the defense in this case. Such testimony would not be admissible under Fed.R.Evid. 702 because the effectiveness of defense counsel is a mixed question of fact and law and the court would not be assisted by the views of other lawyers as to their thoughts as to what counsel should or should not have done.

The ultimate question is whether there is any basis for belief that jurors deciding Mr. McVeigh's case were not impartial because of bias or preconceived notions as to his guilt or the appropriateness of the penalty of death. That requires more than exposure to publicity or some prior opinion about it. Complete absence of awareness of so highly publicized a crime as this would be an impossible requirement for seating a jury. There must be a basis for disbelieving the jurors' statements under oath that they could and would set aside such information or opinions and decide the case on the evidence presented, following the court's instructions. The defendant has not made that showing.

The contention that trial counsel did not maintain adequate security to prevent leaks to the media does not meet the prejudice component of the *Strickland* standard. One effect of this claimed lack of security is the publicity surrounding the *Dallas Morning News* and *Playboy* stories. That, together with all other pretrial publicity, was adequately addressed in *voir dire* and did not prevent the seating of a fair and impartial jury.

Michael Fortier, a witness who made a plea agreement with the government, was

cross-examined by Mr. Jones extensively as to his direct testimony, his prior public contradictory statements, his motivation for cooperating and his lifestyle. The criticism now raised is that defense counsel had much more information that was not used in that cross-examination. The attack on Fortier's credibility was not limited to cross examination. Evidence about his drug use and unsavory life style was presented in the defendant's case. Mr. McVeigh contrasts Mr. Jones' questioning of this witness with that conducted by counsel for Terry Nichols at his trial. The comparison is not relevant to the *Strickland* analysis because the weight and nature of all of the evidence presented at the separate trials of the two defendants were different as is demonstrated by the difference in verdicts. The testimony of Michael Fortier was not significant evidence in the trial of Timothy McVeigh because of the strength of the other evidence.

On August 4, 2000, Mr. McVeigh moved to dismiss the other claims of ineffective assistance of counsel made in his motion under § 2255 and counsel reaffirmed the withdrawal of those contentions at the oral argument.

The Rule 33 motion for a new trial based on newly discovered evidence relates to the contention that the prosecution withheld information in violation of the obligation to provide exculpatory and impeaching information established in *Brady v. Maryland.* The first contention is that testimony presented at the trial of Terry Nichols, if made available to the defense team at Mr. McVeigh's trial, would have assisted in challenging the admission of and probative value of an exhibit referred to as Q507, admitted as Trial Exhibit 664. That is a piece of the Ryder truck residue that was examined in the FBI laboratory and which an FBI agent said had ammunition nitrate "prills" on it when he examined it. FBI examiner Ron Kelly testified that he found Q507 at the bomb scene and that he thought FBI Agent Wilson took the photograph of its location. Agent Wilson in his testimony in the Nichols trial said that he could not remember taking

the picture. Even with that testimony, the chain of custody was sufficient for admission into evidence at the Nichols trial. The credibility of the FBI laboratory personnel and practices was vigorously attacked by trial counsel.

A second claim is that the government withheld evidence regarding the reliability of the evidence handling procedures in the Oklahoma City field office of the FBI. The specific contention is that two reports, the Trentadue Report and the Mullaley Report, both relating to an investigation of the death of a federal prisoner in August 1995, concluded that there were systemic problems relating to evidence handling. These reports were not based on a review of the evidence handling procedures used by the task force investigating the bombing of the Murrah Building. In fact, a part of the criticism concerned the competence of the technician assigned to the field office to replace the primary technician reassigned to the bombing investigation.

The final contention is that Mr. McVeigh's lawyers have obtained information showing that federal law enforcement officers staged the walkout of Timothy McVeigh from the Noble County Jail in Perry, Oklahoma for news photographers, including television cameras, to publicly "demonize" him. The photographs and television footage became a part of the pretrial publicity that was of great concern in this case. This event was the subject of a court hearing in February, 1997, on a motion to suppress eyewitness identification testimony filed by both defendants, Timothy McVeigh and Terry Nichols. At the conclusion of that evidentiary hearing, the court made oral findings that the "media event" was not staged or even the result of negligence. Tr. of Hearing on February 20, 1997, pp. 713–15.

Assuming that new evidence could result in a contrary conclusion, it would be of no consequence to the motion for new trial. Vacating Mr. McVeigh's conviction and sentence would not be a suitable sanction for any governmental misconduct in staging a "perp walk."

Mr. McVeigh's counsel assert that the stories in the *Dallas Morning News* and *Playboy* resulted from the failure of his former lawyers to protect confidential information. Apart from the pretrial publicity and its effect on jurors, the argument made is that the government was led to witness Tim Chambers because of these stories. Assuming that the government would not have had the Chambers' testimony but for a failure to protect the defense files, there is no prejudice under the *Strickland* standard because his testimony was not sufficiently significant to have affected the verdict. It related only to the purchase of racing fuel and was but one small piece of circumstantial evidence.

The defendant asks for discovery to develop these issues. No discovery is necessary because taken separately or together these allegations, if proven, would not meet the standard for a *Brady* violation or for a new trial because they are not material. They do not provide a basis for finding that if the evidence had been available to the defense, the result of the proceeding would have been different. *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Kyles v. Whitley,* 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

After a full review of the record and consideration of the contentions made in these motions, the court is convinced that Timothy McVeigh received a fair trial before an impartial jury that convicted him on overwhelming evidence of guilt of the crimes charged and then set his sentence at death in a calm and reasonable exercise of their authority representing the conscience of the community.

It is

ORDERED that Timothy J. McVeigh's motions are denied and Civil Action No. 00–M–494 is dismissed.