# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

JAY WESLEY NEILL,

    Plaintiff - Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

    Respondent - Appellee.

No. 00-6024

ORDER

Filed December 7, 2001

Before **TACHA**, Chief Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

Appellant's petition for rehearing by the panel is granted. The opinion on rehearing is filed with this order.

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35, with the exception of Judge Robert H. Henry, who was recused in this matter. Judge Carlos F. Lucero voted to grant, and all other judges of the court voted to deny rehearing en banc.

Therefore, the appellant's petition for rehearing en banc is denied.


Entered for the Court

PATRICK FISHER, Clerk of Court


by:
Belinda A. Begley
Deputy Clerk

FILED

UNITED STATES COURT OF APPEALS     December 7, 2001

TENTH CIRCUIT                          Patrick Fisher, Clerk

JAY WESLEY NEILL,

          Petitioner-Appellant,

v.                                                              No. 00-6024

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

          Respondent-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-97-1318-C)**

James L. Hankins of Hankins Law Office, Enid, Oklahoma, for Petitioner-Appellant.

Sandra D. Howard, Assistant Attorney General, Chief, Criminal Appeals (W.A. Drew Edmondson, Attorney General, with her on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

Before **TACHA**, Chief Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

**TACHA**, Chief Judge.

Petitioner-appellant Jay Wesley Neill appeals the denial of habeas relief, *see* 28 U.S.C. § 2254, from four death sentences. This appeal presents, among other issues, the question of whether Oklahoma can constitutionally apply its statute permitting introduction of victim impact evidence during a capital sentencing proceeding at a trial for crimes occurring prior to that statute's enactment. We conclude Oklahoma can do so without violating the Ex Post Facto or Due Process Clauses. We, therefore, affirm the denial of relief on this, and the remainder of Neill's habeas claims.

## I.    *FACTS*

A jury sentenced Neill to death after convicting him of four counts of first degree malice murder stemming from Neill's armed robbery of a Geronimo, Oklahoma bank in December 1984. Neill did not contest his guilt during the trial's first stage. The State's evidence established that Neill, then age nineteen, and his co-defendant, Grady Johnson, age twenty-one, were roommates involved in a homosexual relationship. In 1984, they were having serious financial difficulties. During the week before the bank robbery, the pair purchased two knives, obtained a gun permit, bought a .32 caliber handgun and ammunition, and made plane reservations to San Francisco for Friday afternoon, December 14. On that Friday, shortly after 1:00 P.M., Neill robbed the bank. During the robbery, Neill stabbed three bank employees to death. All three women died from multiple stab wounds to their head, neck, chest and abdomen. One woman was seven months pregnant. Neill also attempted to decapitate each woman with a knife.

2

Five customers entered the bank during the robbery.  Neill forced all five to lie face down in the back room where the employees had been stabbed.  He then shot each customer in the head, killing one and wounding the other three.  Neill denied attempting to shoot the fifth, an eighteen-month-old child.  The child's father testified, however, that he saw someone point a gun at his child's head and fire several times.  The weapon, by this time, was out of ammunition.

Neill and Johnson then flew to San Francisco, where they spent some of the approximately $17,000 stolen from the bank on expensive jewelry and clothing, hotels, limousines and cocaine.  FBI agents arrested the pair there three days after the robbery.

Prior to this trial, Neill gave a videotaped interview to a religious television program, "The 700 Club," and wrote several letters to an author writing a book about the murders.  Neill also wrote letters and made telephone calls apologizing to several victims.  In these communications,[1] Neill admitted committing the crimes.  Based on this evidence, the jury convicted Neill of four counts of first degree malice murder, three counts of shooting with intent to kill and one count of attempted shooting with intent to kill.

At sentencing, the State charged and the jury found, as to each murder, three aggravating factors:  Neill had created a great risk of death to more than one person; he

---

[1]     The State had initially tried Neill and Johnson jointly.  The Oklahoma Court of Criminal Appeals, however, reversed their resulting convictions, holding, among other errors, that the trial court should have severed their trials.  *See Neill v. State*, 827 P.2d 884 (Okla. Crim. App. 1992).  Neill gave this videotaped interview and wrote these letters in between his first and second trials.

3

had committed the murders to avoid arrest and prosecution; and the murders were especially heinous, atrocious or cruel. The jury imposed four death sentences, as well as twenty years' imprisonment for each non-capital conviction.

The Oklahoma Court of Criminal Appeals affirmed Neill's convictions and death sentences, and denied post-conviction relief. *See Neill v. State*, 896 P.2d 537 (Okla. Crim. App. 1994), *cert. denied*, 516 U.S. 1080 (1996); *Neill v. State*, 943 P.2d 145 (Okla. Crim. App. 1997).

## II.    STANDARDS OF REVIEW

Because Neill filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that Act governs this appeal. *See Williams v. Taylor*, 529 U.S. 362, 402 (2000). Neill, therefore, will not be entitled to habeas relief unless he can establish that the state court resolved his claims "contrary to," or based on "an unreasonable application of," clearly established Supreme Court precedent, 28 U.S.C. § 2254(d)(1), or "on an unreasonable determination of the facts in light of the evidence," *id.* § 2254(d)(2). We presume state court factual findings are correct, absent clear and convincing evidence to the contrary. *See id.* § 2254(e)(1).

Where the state court did not address the merits of a habeas claim, however, this court reviews the district court's decision *de novo*, reviewing any factual findings only for clear error. *See, e.g., Thomas v. Gibson*, 218 F.3d 1213, 1220 (10th Cir. 2000).

4

### III. DISCUSSION

**A.** ***Application of Oklahoma's newly enacted victim impact legislation at Neill's retrial****.* In 1991, after Neill's first trial, the United States Supreme Court, reversing its earlier precedent, held that states could constitutionally admit victim impact evidence during capital sentencing proceedings. *See Payne v. Tennessee*, 501 U.S. 808, 824-27 (1991). Oklahoma, in 1992, enacted legislation permitting introduction of such evidence. *See* Okla. Stat. tit. 21, § 701.10(C); *see also id.* tit. 22, §§ 984, 984.1, 991a(D). Neill argues that applying this statute retrospectively to permit the State to introduce victim impact evidence at his 1992 retrial for these 1984 crimes violated the Ex Post Facto and Due Process Clauses. Specifically, Neill asserts that applying this statute at his retrial implicated the fourth category of ex post facto legislation recognized in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798)--"[e]very law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *See also Carmell v. Texas*, 529 U.S. 513, 521-22, 525, 534 (2000) (reaffirming validity of *Calder*'s fourth ex post facto category). Although the state appellate court rejected this claim, it did not specifically address *Calder*'s fourth category. *See Neill*, 896 P.2d at 553-54.

Neill relies on *Carmell*. That case, however, is distinguishable. In *Carmell*, the Supreme Court addressed the retrospective application of a Texas law providing that certain sex offenses could be established solely on the victim's testimony, when

previously they would have required additional corroborating evidence. *See* 529 U.S. at 516. The Court, applying *Calder*'s fourth category, *see Carmell*, 529 U.S. at 522, held retrospective application of this Texas statute violated the ex post facto prohibition because this legislation "changed the quantum of evidence necessary to sustain a conviction." *Id.* at 530; *see also id.* at 531, 532-33, 546. This change in the quantum of evidence "subverts the presumption of innocence." *Id.* at 532. In addition, the Court noted that the Texas statute did not simply regulate the mode by which the parties could place facts before the jury, but rather "govern[ed] the sufficiency of those facts for meeting the burden of proof." *Id.* at 545; *see also id.* at 546-47.

In contrast, Oklahoma's victim impact statute does not change the quantum of evidence necessary for the State to obtain a death sentence, nor does it otherwise subvert the presumption of innocence. *See id.* at 530-34; *see also Thompson v. Missouri*, 171 U.S. 380, 387 (1898). Further, the Oklahoma statute leaves for the jury to determine the victim impact evidence's sufficiency or effect. *See Carmell*, 529 U.S. at 545-47; *see also Thompson*, 171 U.S. at 387. Moreover, "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Payne*, 501 U.S. at 825.

This case is more analogous to *Thompson*, upon which the district court relied to deny Neill habeas relief. In *Thompson*, the Court held that retrospectively applying a

6

state statute permitting handwriting experts' testimony did not violate the Ex Post Facto

Clause. *See* 171 U.S. at 380-82, 386-88.

> "Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not . . . alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. . . . The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. . . . [A]lterations which do not increase the punishment, nor change the ingredients of the offence, or the ultimate facts necessary to establish guilt, but--leaving untouched the nature of the crime and the amount or degree of proof essential to conviction--only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure."

*Id.* at 385-86 (quoting *Hopt v. Utah*, 110 U.S. 574, 589-90 (1884)). Further, the

*Thompson* Court indicated it could not

> perceive any ground upon which to hold a statute to be *ex post facto* which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offence was committed . . . . The statute [at issue] did nothing more than remove an obstacle . . . that withdrew from the consideration of the jury testimony which, in the opinion of the legislature, tended to elucidate the ultimate, essential fact to be established . . . .

*Id.* at 387.

Neill argues, however, that *Thompson* is distinguishable from his case because,

while expert handwriting testimony could benefit either the State or the defendant,

7

Oklahoma's victim impact evidence benefits only the State and would always be detrimental to the capital defendant. *See also Carmell*, 529 U.S. at 533 & n.23, 546. In *Carmell*, the Court did discuss this factor, noting first that "[o]rdinary rules of evidence, for example, do not violate the [Ex Post Facto] Clause." *Id.* at 533 n.23. The Court further indicated that these "ordinary rules of evidence . . . are ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case." *Id.; see id.* at 546 (noting changes lowering quantum of proof, and thus implicating Ex Post Facto Clause, will always inure to State's benefit, but witness competency laws "do not necessarily run in the State's favor"); *see also Thompson*, 171 U.S. at 387-88. But that factor alone is not dispositive. *See McCulloch v. State*, 39 S.W.3d 678, 684 (Tex. Ct. App. 2001). Rather, the *Carmell* Court noted that, "[m]ore crucially, such [ordinary rules of evidence], by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption." 529 U.S. at 533 n.23. Despite the fact that Oklahoma's statute permitting victim impact evidence benefits only the State,[2] therefore, it does not violate the ex post facto prohibition here because it neither changes the quantum of proof nor otherwise subverts the presumption of innocence. *See Carmell*,

---

[2]     Admitting victim impact evidence, however, does not weight the capital sentencing proceeding in the State's favor. Rather, *Payne* held the State could present victim impact evidence, in part, to counter a capital defendant's right to present any mitigating evidence. *See* 501 U.S. at 822-23, 825-26.

529 U.S. at 530-33 & 533 n.23.  The "inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed."  *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 510 n.6 (1995) (further quotation omitted).  Neill, therefore, is not entitled to habeas relief.

      **B.**      ***Second-stage jury instruction.***  Oklahoma law provides that, if a capital sentencing jury cannot reach a unanimous verdict within a reasonable time, the trial court shall impose a life sentence, either with or without the possibility of parole.  *See* Okla. Stat, tit. 21, § 701.11.  The Eighth Amendment, however, does not require the trial court to instruct jurors on the consequences of their failure to agree.  *See Jones v. United States*, 527 U.S. 373, 381 (1999).  Neill argues the Constitution, nonetheless, did require such an instruction in this case because here the prosecutor affirmatively misinformed jurors that if they failed to reach a unanimous sentencing decision, there would be another retrial.  *See* Trial tr. vol. V at 1315.  *Jones* does indicate that, "[i]n theory, the . . . failure to instruct the jury as to the consequences of deadlock could give rise to an Eighth Amendment problem," noting "a jury cannot be 'affirmatively misled regarding its role in the sentencing process.'"  527 U.S. 381-82 (quoting *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)).

      Because the Oklahoma Court of Criminal Appeals denied relief solely on state law grounds, *see Neill*, 896 P.2d at 557, this court reviews this constitutional claim *de novo*.  *See Thomas*, 218 F.3d at 1220.

Although the prosecutor did, at one point, misstate Oklahoma law, his argument as a whole did not mislead the jury. Following his misstatement that the jury's failure to reach a unanimous sentencing decision would result in another retrial, the prosecutor argued that if defense counsel could get one juror to vote against the death penalty, that punishment could not be imposed. *See* Trial tr. vol. V at 1321. Defense counsel also argued to the jury that, if one of them believed death was not the appropriate punishment, that juror should hold out and the judge would eventually declare a deadlock and impose a life sentence without the possibility of parole. *See id.* at 1308, 1313. Further, the prosecutor ended his argument by asserting that there was no mistrial at sentencing and that if one juror "cannot agree [to a death sentence], then it's life without parole." *Id.* at 1327. In light of the entire record, then, the prosecutor's single misstatement did not mislead the jury concerning its sentencing role. An instruction on the consequences resulting from the jury's failure to reach a unanimous sentencing decision, therefore, was unnecessary. *See Jones*, 527 U.S. at 381-82.

For these same reasons, Neill's claims that his trial attorney was ineffective for failing to object to the prosecutor's misstatement, and to object to the prosecutor's argument generally concerning the possibility of another retrial, lack merit.[3] *See, e.g.,Werts v. Vaughn*, 228 F.3d 178, 205 (3d Cir. 2000), *cert. denied*, 121 S. Ct. 1621

---

[3] As explained in section III(D)(1), *infra*, while Neill has procedurally defaulted his prosecutorial misconduct allegations, we will address his related ineffective-assistance claims.

10

(2001); *see also Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) (noting that, before assessing whether defense counsel was ineffective for failing to object to prosecutorial misconduct, habeas court must first determine whether prosecutor in fact committed misconduct).

     *C.*     ***Denial of impartial jury.***  A capital defendant may challenge for cause any juror who will automatically vote to impose a death sentence upon a first degree murder conviction. *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Relying on *Morgan*, Neill argues that the trial court and his defense attorney failed to question three individuals who sat on Neill's jury--Hyde, Loggins, and Hannabass--concerning whether each could consider imposing a sentence less than death if the jury did convict Neill of first degree murder. On appeal to this court, Neill asserts three theories warranting habeas relief on this claim: 1) having any one of these three individuals on the jury violated *Morgan*; 2) the trial court's failure to pose this question *sua sponte* deprived Neill of due process and a fundamentally fair trial; and 3) defense counsel was constitutionally ineffective for failing to make this inquiry.

     *1.*     ***Procedural posture.***  Because Neill did not challenge these three jurors until his state post-conviction application, the Oklahoma Court of Criminal Appeals held he had waived these claims. *See Neill*, 943 P.2d at 147-48. That state procedural bar is adequate to preclude habeas review of Neill's *Morgan* and due process claims. *See Hale v. Gibson*, 227 F.3d 1298, 1328 (10th Cir. 2000) (Oklahoma's procedural bar, applicable

11

to most claims not raised on direct appeal, except ineffective-assistance claims, is adequate and independent default rule), *cert. denied*, 121 S. Ct. 2608 (2001). Neill does not assert either cause and prejudice excusing this default, nor that this court's refusal to consider these claims would result in a fundamental miscarriage of justice. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Neill's procedural default, therefore, precludes federal habeas review. *See id.*

The State's procedural bar, however, is not adequate to preclude habeas review of Neill's ineffective-assistance claim because the same attorney represented Neill both at trial and on direct appeal. *See English v. Cody*, 146 F.3d 1257, 1263 (10th Cir. 1998); *see also Walker v. Gibson*, 228 F.3d 1217, 1231-32 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 2560 (2001). Accordingly, the State concedes that the merits of that claim are properly before this court. *See* Appellee's Br. at 22-23.

          **2.**    *Ineffective assistance of trial counsel.*  This court's inquiry is thus limited to whether trial counsel was ineffective for failing to ask these three jurors if they would automatically vote to impose a death sentence upon Neill's first degree murder conviction. To succeed, Neill must establish both that counsel's performance was deficient and Neill's defense was thereby prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the state appellate court did not address this claim's merit, this court's review is *de novo*. *See Thomas*, 218 F.3d at 1220; *see also Smith v. Gibson*,

12

197 F.3d 454, 461 (10th Cir. 1999) (reviewing ineffective assistance claims, which present mixed questions of law and fact, *de novo*), *cert. denied*, 531 U.S. 839 (2000).

Generally, "[a]n attorney's actions during voir dire are considered to be matters of trial strategy," which "cannot be the basis" of an ineffective assistance claim "unless counsel's decision is . . . so ill chosen that it permeates the entire trial with obvious unfairness." *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997); *see also Hale*, 227 F.3d at 1317-18; *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir.), *cert. denied*, 531 U.S. 938 (2000). Further,

> [l]awyers experienced in the trial of capital cases have widely varying views about addressing the delicate balance between the disqualification of jurors whose personal beliefs prevent them from ever imposing the penalty of death under *Witherspoon v. Illinois*, 391 U.S. 510, 520-23 . . . (1968), and those who would automatically recommend that sentence if they found the defendant guilty. *Morgan* . . ., 504 U.S. 719 . . . . The difficulty of the task is greater where[, as here,] there has been widespread publicity and public comment about the crime, the investigation and pre-trial proceedings . . . .

*United States v. McVeigh*, 118 F. Supp. 2d 1137, 1152 (D. Colo. 2000) (28 U.S.C. § 2255 proceeding).

Here, defense counsel indicated to Neill, prior to trial, that he intended to concentrate specifically on voir dire matters and he hoped thereby to create reversible error. *See* Post-conviction application, app. E at 4, 14, 16. Further, either defense counsel or the prosecutor asked all other prospective jurors whether they would consider imposing a sentence less than death. Trial counsel, therefore, was well aware of the need for this inquiry. Nevertheless, the record is insufficient to permit this court to determine

13

whether defense counsel's failure to ask only these three jurors whether they would automatically vote for a death sentence was strategic and, if so, whether that strategy was reasonable.

Regardless, Neill has failed to establish any resulting prejudice. *See Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (noting court may consider *Strickland*'s prejudice component without first addressing adequacy of counsel's performance). To do so, Neill must show "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Because "[i]f even one" juror who would automatically vote for a death sentence "is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence," *Morgan*, 504 U.S. at 729, we address whether any of these jurors would have automatically voted to impose a death sentence, *see McVeigh*, 118 F. Supp. 2d at 1152 (noting, in addressing similar ineffective-assistance claim, that "[t]he primary focus is on the jurors' willingness to consider a life sentence after finding the defendant guilty of the crimes charged"); *see also Hale*, 227 F.3d at 1320 (addressing claim that defense counsel was ineffective for failing to remove biased jurors during voir dire by requiring petitioner to show jurors were in fact biased).

To that end, Neill proffers his investigators' affidavits indicating that, four years after the trial, Juror Loggins "felt that the death penalty was the only appropriate

14

punishment for murder, under any circumstances," Post-conviction application, app. H at 4, 12, and Juror Hyde "felt that if you take a life, you deserve the same sentence," *id.* at 16, 17. The district court, however, did not abuse its discretion in refusing to consider these affidavits, deeming them inadmissible hearsay.[4] *See United States v. Davis*, 60 F.3d 1479, 1484 (10th Cir. 1995) (direct criminal appeal) (noting district court has discretion to refuse to consider jury consultant's affidavit containing hearsay concerning what jurors had told her); *see also Western Spring Serv. Co. v. Andrew*, 229 F.2d 413, 419 (10th Cir. 1956) (holding, in civil action, that attorney's affidavit concerning what juror told attorney was hearsay, entitled to no consideration).

Even assuming this court could consider these affidavits, *cf. Walker*, 228 F.3d at 1233, they fail to show prejudice, *cf. Hale*, 227 F.3d at 1319 (noting, in addressing claim that trial counsel was ineffective for failing to remove jurors with preconceived belief defendant was guilty, that "[t]o show a juror was biased," petitioner must show more than that the juror "had a preconceived notion of guilt;" he "must show that the juror had such a fixed opinion that he or she could not judge impartially"). Neill's affidavits attribute to these jurors single, brief, conclusory statements, without providing the context in which these jurors made these statements, nor the time frame during which they were to have held these beliefs. Moreover, "[c]onsideration of statements made by trial jurors after

---

[4] The district court specifically addressed only the affidavits concerning Juror Loggins.

15

they experienced the entire trial and sentencing hearing and after deliberating on the verdicts are not reasonably probative of . . . whether [jurors] could consider the evidence with open minds and follow the court's instructions on the law . . . ." *McVeigh*, 118 F. Supp. 2d at 1153.

Apart from these affidavits, Neil points to Juror Hannabass's response to the question posed to him during voir dire as to whether he could consider imposing a death sentence. Juror Hannabass answered "I can do it. I would like to." Trial tr. vol II. at 470-71. Neither defense counsel nor anyone else further questioned this juror concerning his ability to consider imposing a sentence less than death. Nonetheless, this ambiguous voir dire response, without more, is insufficient to establish that Juror Hannabass would have automatically voted to impose a death sentence, upon Neill's first degree murder conviction. *Cf. Moore v. Gibson*, 195 F.3d 1152, 1170 (10th Cir. 1999) (holding trial judge, in finding juror impartial and thus qualified to serve, and aided by judge's assessment of juror's credibility, may resolve any ambiguity in juror's voir dire response in State's favor).

For these same reasons, neither the investigators' affidavits nor the voir dire transcript are sufficient to have required the district court to conduct an evidentiary hearing. *See Walker*, 228 F.3d at 1231. Neill, therefore, is not entitled to habeas relief on this ineffective-assistance claim.

16

**D.** ***Prosecutorial misconduct.*** Neill challenges several comments the prosecutor made, arguing both that the remarks were improper and trial counsel was ineffective for failing to object to them at trial. Because Neill did not assert these prosecutorial-misconduct claims until his state post-conviction application, however, the Oklahoma appellate court deemed him to have waived them. *See Neill*, 943 P.2d at 147-48. That independent state procedural bar will be adequate to preclude federal habeas review, unless Neill can establish cause and prejudice excusing his default, or that this court's refusal to consider these claims will result in a fundamental miscarriage of justice. *See, e.g., Hale*, 227 F.3d at 1328; *see also Coleman*, 501 U.S. at 750. Neill does not here assert a fundamental miscarriage of justice. Instead, as cause excusing his default, Neill argues that his appellate attorney was ineffective for failing to raise these prosecutorial-misconduct claims on direct appeal. *See generally Coleman*, 501 U.S. at 752-54 (holding constitutionally ineffective assistance can establish cause excusing procedural default). *Strickland v. Washington,* 466 U.S. 668 (1984), governs this ineffective-appellate-assistance inquiry. *See Smith*, 528 U.S. at 285; *see also Coleman*, 501 U.S. at 752. Neill, therefore, must establish both that counsel's performance was deficient and that his defense was thereby prejudiced. *See Strickland*, 466 U.S. at 687. Here, the relevant questions are whether appellate counsel was "objectively unreasonable" in failing to raise these prosecutorial-misconduct claims on direct appeal and, if so, whether there is a "reasonable probability that, but for his counsel's

17

unreasonable failure" to raise these claims, Neill "would have prevailed on his appeal." *Smith*, 528 U.S. at 285-86 (applying *Strickland*, 466 U.S. at 687-91, 694). "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue."[5] *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999).

Applying *Strickland*, the state appellate court held Neill had failed to establish that direct-appeal counsel's performance was deficient. *See Neill*, 943 P.2d at 148. Our review under AEDPA, then, is further restricted to determining whether the state appellate court, in denying relief, unreasonably applied *Strickland*.[6] *See* 28 U.S.C. §

---

[5] This court has expressed this test in terms of appellate counsel's omitting a "dead-bang winner," often defined in part as a claim that "would have resulted in a reversal on appeal." *United States v. Cook*, 45 F.3d 388, 395 (10th Cir. 1995). To the extent this language can be read as requiring the defendant to establish that the omitted claim would have resulted in his obtaining relief on appeal, *see, e.g.*, *Smith v. Massey*, 235 F.3d 1259, 1274 (10th Cir. 2000), *cert. denied*, 70 U.S.L.W. 3241 (U.S. Oct. 1, 2001) (No. 01-5117); *Walker v. Gibson*, 228 F.3d 1217, 1237 (10th Cir. 2000), *cert. denied*, 121 S. Ct. 2560 (2001), rather than there being only a reasonable probability the omitted claim would have resulted in relief, *see Banks v. Reynolds*, 54 F.3d 1508, 1515 n. 13 (10th Cir. 1995), this language conflicts with *Strickland*. *See* 466 U.S. at 694. The en banc court, therefore, expressly disavows the use of the "dead-bang winner" language to imply requiring a showing more onerous than a reasonable probability that the omitted claim would have resulted in a reversal on appeal.

[6] The state appellate court specifically held that Neill had failed to present any facts "supporting his allegation that direct appeal counsel was ineffective for omitting [these prosecutorial-misconduct] issues." *Neill* 943 P.2d at 148. In denying relief, therefore, the Oklahoma Court of Criminal Appeals did not specifically address appellate counsel's failure to raise each instance of alleged prosecutorial misconduct. Nonetheless, under AEDPA, this court still defers to the state appellate court's decision denying relief, even though that court did not expressly state its reasoning on each specific claim. *See, e.g., Walker*, 228 F.3d at 1241 (citing *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999)).

2254(d)(1); *see also, e.g., Elliott v. Williams*, 248 F.3d 1205, 1208 (10th Cir. 2001), *cert. denied*, 2001 WL 914885 (U.S. Oct. 1, 2001) (No. 01-5508).

Neill also argues that his trial attorney was ineffective for failing to object at trial to the prosecutor's improper comments. The state appellate court deemed Neill to have also defaulted these ineffective-trial-counsel claims because Neill likewise did not raise these claims until his state post-conviction application. *See Neill*, 943 P.2d at 147-48. Because Neill had the same attorney at trial and on direct appeal, however, this procedural bar is not adequate to preclude our habeas review. *See English*, 146 F.3d at 1263. We, therefore, also address the merits of Neill's ineffective-trial-counsel claims.

Under *Strickland*, then, Neill must again establish both trial counsel's deficient performance and resulting prejudice to his defense. *See* 466 U.S. at 687. In the context of a capital sentencing proceeding, the relevant prejudice inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. Because the state appellate court did not address the merits of Neill's ineffective-trial-counsel claims, our review is *de novo*. *See Thomas*, 218 F.3d at 1220; *see also Smith*, 197 F.3d at 461.

To resolve these claims, therefore, we focus on the merits of the underlying prosecutorial-misconduct claims. *See Hooks*, 184 F.3d at 1221; *see also Werts*, 228 F.2d at 205 (holding trial counsel's performance cannot be ineffective for failing to object to

19

the prosecutor's proper remarks).  Where a prosecutorial misconduct claim does not implicate any specific constitutional right, Neill will be entitled to habeas relief only if the prosecutor's improper remark resulted in a fundamentally unfair proceeding.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 645 (1974); *see also, e.g., Rojem v. Gibson*, 245 F.3d 1130, 1142 (10th Cir. 2001).  If, instead, the challenged comment implicates a specific constitutional right, then Neill will not have to establish that the remark rendered the entire proceeding fundamentally unfair.  *See, e.g., Walker*, 228 F.3d at 1241.

      *1.    Mitigating evidence.*  During second-stage closing argument, the prosecutor addressed each of Neill's five proffered mitigating factors, arguing none of them justified a sentence less than death under Oklahoma law.  While Neill has the right to have the jury consider any constitutionally relevant mitigating evidence he presents, *see, e.g., Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), citing cases, "[t]he prosecutor is permitted to comment upon and to argue the appropriate weight to be given mitigating factors," *Walker*, 228 F.3d at 1243; *see also, e.g., Fox*, 200 F.3d at 1299-1300.  Further, the trial court did instruct jurors that it was their duty to determine what circumstances were mitigating.  *See, e.g., Walker*, 228 F.3d at 1243.  The prosecutor's argument, therefore, was not improper.  Neill's trial attorney, thus, could not have been constitutionally ineffective for failing to object to it.  *See, e.g., Werts*, 228 F.3d at 205.

20

Nor was appellate counsel objectively unreasonable for failing to raise this claim on direct appeal. *See Smith*, 528 U.S. at 285 (applying *Strickland*, 466 U.S. at 687-91). The state appellate court, therefore, did not unreasonably apply *Strickland* to deny Neill relief on this ineffective-appellate-counsel claim.

   **2.   Caldwell[7] *violation.*** In response to defense counsel's argument that the responsibility to impose, or to prevent, a death sentence rested with each individual juror, the prosecutor argued that "an undue and unfair burden has been placed . . . squarely on your shoulders that if any of you do not hold out then it's gonna be your responsibility and you're gonna be the one that has caused Jay Neill to be executed. That's not our law." Trial tr. vol. V at 1314.

*Caldwell* precludes improperly diminishing capital jurors' sense of responsibility for imposing a death sentence. *See* 472 U.S. at 323, 328-29, 341. This includes remarks inaccurately describing the jury's role under state law. *See Romano*, 512 U.S. at 9. Considered in the context of the entire trial, *see Walker*, 228 F.2d at 1243, however, the prosecutor's remarks here did not mislead jurors as to their role in sentencing Neill to death. *See, e.g., Pickens v. Gibson*, 206 F.3d 988, 999-1000 (10th Cir. 2000). Moreover, the prosecutor had earlier argued that the jurors were there to decide whether to give Neill the death penalty. *See Walker*, 228 F.3d at 1243. And the trial court instructed jurors that it was their "duty to determine the penalty to be imposed." O.R. at 130; *see Walker*, 228

---

[7]    *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (plurality).

21

F.3d at 1243. Because these challenged remarks, considered in the context of the entire trial, did not violate *Caldwell*, trial counsel was again not ineffective for failing to object. *See, e.g., Werts*, 228 F.3d at 205.

Similarly, direct-appeal counsel was not objectively unreasonable for failing to raise this *Caldwell* claim on direct appeal. *See Smith*, 528 U.S. at 285 (applying *Strickland*, 466 U.S. at 687-91). The Oklahoma Court of Criminal Appeals, therefore, did not unreasonably apply *Strickland* to deny Neill relief on his ineffective-appellate-counsel claim based on these remarks. *See* 28 U.S.C. § 2254(d)(1).

Neill also complains that the prosecutor violated *Caldwell* by suggesting to jurors that their decision to impose a death sentence was just a recommendation. In addition, Neill challenges the prosecutor's remarks again urging jurors not to "put the undue burden on your shoulder that you're the cause of the person losing their life or you're the cause of starting this down the track. You've done nothing . . . ." Trial tr. vol. V at 1325. Later, the prosecutor informed jurors that they were "only one step in the process." *Id.* at 1326. Because defense counsel objected to these comments, *see id.* at 1315, 1325-26, however, Neill's ineffective-trial-counsel claim fails.

Further, these remarks did not mislead jurors as to their sentencing role under state law. *See Romano*, 512 U.S. at 9; *see also Johnson v. Gibson*, 254 F.3d 1155, 1161-62 (10th Cir. 2001), *petition for cert. filed,* (U.S. Sept. 24, 2001) (No. 01-6566). Appellate counsel, therefore, was not objectively unreasonable in failing to raise this *Caldwell* claim

22

on direct appeal. *See Smith*, 528 U.S. at 285 (applying *Strickland*, 466 U.S. at 687-91).

Nor was there a "reasonable probability" that, had counsel raised this claim, Neill "would

have prevailed" on direct appeal. *Id.* at 285-86 (applying *Strickland*, 466 U.S. at 694).

The state appellate court, therefore, did not unreasonably apply *Strickland* to deny Neill

relief on this ineffective-appellate-assistance claim. *See* 28 U.S.C. § 2254(d)(1).

  **3.** *Comments on Neill's homosexuality*. Lastly, Neill challenges as

inflammatory the prosecutor's two remarks concerning Neill's homosexuality. First, the

prosecutor, challenging Neill's proffered mitigating factor that he was acting under an

extreme emotional disturbance when he committed these crimes because he feared losing

his relationship with Johnson, noted Neill was "a vowed homosexual. He had a gay lover

he didn't want to lose." Trial tr. vol. V at 1283. The prosecutor then compared Neill's

situation to the breakup of a heterosexual relationship or marriage, arguing neither

situation justified murder. *See id.* These comments on Neill's homosexuality were

accurate, in light of the evidence, and were relevant to both the State's case and Neill's

defense theory. *See Clayton v. Gibson*, 199 F.3d 1162, 1174 (10th Cir. 1999) (upholding

prosecutor's accurate and relevant comments), *cert. denied*, 531 U.S. 838 (2000). Neill

testified during the trial's second stage about his turbulent relationship with Johnson.

And, prior to closing arguments, he proffered an instruction listing his mitigating factors,

including the fact that Neill "was suffering extreme mental and emotional disturbances

with regard to his relationship with Robert Grady Johnson which affected his mental

thought processes." O.R. v. II at 138. "[T]he prosecutor is permitted to comment upon and to argue the appropriate weight to be given mitigating factors." *Walker*, 228 F.3d at 1243. Trial counsel, therefore, was not ineffective for failing to object to this remark. *See, e.g., Werts*, 228 F.3d at 205.

For these same reasons, direct-appeal counsel was not objectively unreasonable for failing to raise this claim on direct appeal. *See Smith*, 528 U.S. at 285 (applying *Strickland*, 466 U.S. at 687-91). And there was not a "reasonable probability that, but for his counsel's unreasonable failure" to raise this claim, Neill "would have prevailed on his appeal." *Id.* at 285-86 (applying *Strickland*, 466 U.S. at 694). The state appellate court's decision denying relief on Neill's ineffective-appellate-assistance claim, therefore, reasonably applied *Strickland*. *See* 28 U.S.C. § 2254(d)(1).

The prosecutor made a second comment on Neill's homosexuality:

> If I could ask each of you to disregard Jay Neill and take him out of the person but consider these things in a generic way. I want you to think briefly about the man you're sitting in judgment on . . . and believe me, . . . you have every thing in this case, the good, the bad, everything that the law allows to aid you in this decision. But just generic, just put in the back of your mind what if I was sitting in judgment on this person without relating it to Jay Neill, and I'd like to go through some things that to me depict the true person, what kind of person he is. He is a homosexual. The person you're sitting in judgment on -- disregard Jay Neill. You're deciding life or death on a person that's a vowed [sic] homosexual.

Trial tr. vol. V at 1285-86. Defense counsel then unsuccessfully objected. Because he did so, he did not provide constitutionally ineffective representation.

The prosecutor continued

24

> I don't want to import to you that a person's sexual preference is an aggravating factor. It is not. But these are areas you consider whenever you determine the type of person you're setting in judgment on. . . . The individual's homosexual. He's in love with Robert Grady Johnson. He'll do anything to keep his love, anything.

*Id.* at 1287

There does not appear to be any legitimate justification for these remarks. They are improper. Nonetheless, "not every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation." *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir.) (citing *Caldwell*, 472 U.S. at 338), *cert. denied*, 531 U.S. 1055 (2000). Rather, to warrant habeas relief, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting [sentencing decision] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (further citation, quotations omitted). In considering whether the prosecutor's remark rendered the trial fundamentally unfair, this court considers the prosecutor's remark "in context, considering the strength of the State's case and determining whether the prosecutor's challenged remarks plausibly could have tipped the scales in favor of the prosecution." *Rojem*, 245 F.3d at 1142-43 (further quotation omitted); *see also Donnelly*, 416 U.S. at 643 (considering fundamental fairness in light of entire proceedings). "Ultimately, we consider the probable effect the prosecutor's remarks had on the jury's ability to judge the evidence fairly." *Rojem*, 245 F.3d at 1143.

25

In this case, without in any way condoning the prosecutor's remarks, we cannot say that they tipped the scales of justice in the State's favor or precluded jurors from considering the evidence fairly. The State's evidence, which was largely undisputed, overwhelmingly established that, during a bank robbery, Neill stabbed three bank employees to death, including one woman who was seven months pregnant. Neill also attempted to decapitate each woman with a knife. He forced the five customers who entered the bank during the robbery to lie face down in the back room where he had stabbed the bank employees. Neill then shot four customers in the head, killing one and wounding three others, and attempted to shoot the fifth, an eighteen-month-old child. Afterwards, Neill flew to San Francisco with Johnson, where they spent the stolen money on expensive jewelry and clothing, hotels, limousines and cocaine. Except for trying to shoot the child, Neill admits committing these crimes. In addition to overwhelmingly establishing Neill's guilt, this evidence also fully supports the three charged aggravating factors: Neill created a great risk of death to more than one person; he committed these murders to avoid arrest and prosecution for the bank robbery; and the murders were especially heinous, atrocious or cruel.

Neill did present some significant mitigating evidence. He admitted committing these crimes, with the exception of trying to shoot the child, and he expressed his remorse. In addition, Neill testified at sentencing concerning his background, including his childhood medical problems, his physically abusive father and stepfather, Neill's

26

newly found Christian faith, his relationship with Johnson, and Neill's hope that his testifying would facilitate his and the victims' healing. He also assured jurors that he would not pursue any appeals if they sentenced him to life without parole instead of death. Neill further testified that he had corresponded with one of the injured victims, who had forgiven him. And Pamela Matthews, who was the first person in the bank after the robbery and who discovered the victims, also testified concerning Neill's communications with her, his remorse, and her forgiving him.

Nevertheless, in light of the overwhelming evidence supporting Neill's guilt and the charged aggravating factors, weighed against this mitigating evidence, we cannot say that the prosecutor's improper comments influenced the jury's verdict or otherwise rendered the capital sentencing proceeding fundamentally unfair. *See, e.g., Rojem*, 245 F.3d at 1142-43; *see also Tillman*, 215 F.3d at 1129-30.

Because the improper remarks did not result in a fundamentally unfair trial, therefore, appellate counsel was not objectively unreasonable for failing to raise this prosecutorial-misconduct claim on direct appeal. *See Smith*, 528 U.S. at 285 (applying *Strickland*, 466 U.S. at 687-91). Nor was there a reasonable probability that, had appellate counsel raised this claim, Neill would have prevailed on his direct appeal. *See id.* at 285-86 (applying *Strickland*, 466 U.S. at 694).

### E.  *Ineffective representation at sentencing.*

Neill argues his defense attorney ineffectively represented him during the capital sentencing proceeding by failing to investigate and present additional mitigating evidence.  Although the Oklahoma Court of Criminal Appeals held Neill had waived this claim by failing to raise it on direct appeal, *see Neill*, 943 P.2d at 147-48, the State does not continue to assert that procedural default here.  Again, because Neill had the same attorney at trial and on direct appeal, and because the trial record alone would not have been sufficient to resolve this issue, the state procedural bar is, in any event, not adequate to preclude federal habeas review.  *See English*, 146 F.3d at 1264; *see also, e.g., McGregor v. Gibson*, 219 F.3d 1245, 1252-53 (10th Cir. 2000), *overruled on reh'g en banc on other grounds*, 248 F.3d 946 (10th Cir. 2001).  Because the state appellate court did not address this claim's merit, however, we consider it *de novo*.  *See Thomas*, 218 F.3d at 1220.

Neill must establish both that trial counsel's representation at sentencing was deficient, and he was thereby prejudiced.  *See Strickland*, 466 U.S. at 687.  We need address here only whether any alleged deficiency prejudiced Neill.  *See, e.g., Smith*, 528 U.S. at 286 n.14.  In the context of a capital sentencing proceeding, the relevant prejudice inquiry is "whether there is a reasonable probability" that, absent these alleged errors, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  In making this determination, we

28

consider the strength of the State's case, the aggravating circumstances the jury found, the mitigating evidence defense counsel did present, and the additional mitigating evidence the defense might have presented. *See, e.g.,Walker*, 228 F.3d at 1234.

The jury found that Neill had robbed a bank, killing four, wounding three others and attempting to shoot an eighteen-month-old child. The jury further found the existence of three aggravating factors as to each of the four murders. Overwhelming evidence supported these findings. In mitigation, Neill admitted committing these crimes, with the exception of shooting at the child, and expressed his remorse. In addition, Neill testified concerning his background, including his childhood medical problems, his physically abusive father and stepfather, Neill's newly found Christian faith, his relationship with Johnson, and Neill's hope that his testifying would facilitate his and the victims' healing. He also assured jurors that he would not pursue any appeals if they sentenced him to life without parole instead of death. Pamela Matthews, who was the first person in the bank after the robbery and who discovered the victims, also testified concerning Neill's communications with her, his remorse, and her forgiving him.

Neill now argues that trial counsel should have investigated and presented additional available mitigating evidence from Neill's friends and family indicating that he was, among other things, clean cut, loving, well behaved, easygoing, nonviolent, caring, funny, outgoing, with lots of friends and girlfriends, compassionate, intelligent, loved, devoted to his family, hardworking, and sincere in his apologies for the crimes. Neill

29

further asserts defense counsel should have obtained a psychiatric evaluation, which would have shown that Neill had previously suffered a number of head injuries resulting in unconsciousness and he had deficits in his reasoning, judgment and problem-solving abilities, which would have been exacerbated by his emotional stress at the time these crimes occurred.

In light of the State's strong case and the number of aggravators the jury found, there is no reasonable probability that, had trial counsel presented this additional mitigating evidence, the jury would have imposed a sentence less than death. *See, e.g.*, *Walker*, 228 F.3d at 1234; *Hale*, 227 F.3d at 1316-17; *Smith*, 197 F.3d at 463-64.


**F.** **Trial court's refusal to define further life sentence without possibility of parole.** The trial court instructed jurors that they could consider imposing sentences of death, life imprisonment, or life imprisonment without the possibility of parole. Neill challenges the trial court's refusal to instruct further as to the meaning of life without parole. The state appellate court held Neill had waived this claim by failing to raise it on direct appeal. *See Neill*, 943 P.2d at 149-50. Although the State continues to assert this procedural default, we instead address this claim's merit, because the denial of relief can be "more easily and succinctly affirmed" on that basis. *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir.), *cert. denied*, 531 U.S. 982 (2000).

This court has previously determined that the trial court need not further define life without the possibility of parole. *See Mayes v. Gibson*, 210 F.3d 1284, 1294 (10th Cir.), *cert. denied*, 531 U.S. 1020 (2000). Additionally, while Neill relies on *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality), that decision concerned capital cases where a defendant's future dangerousness is at issue, *see, e.g., O'Dell v. Netherland*, 521 U.S. 151, 153 (1997); *Mayes*, 210 F.3d at 1294. Here, however, the State did not charge Neill with the continuing threat aggravator.

**G.     Cumulative error.** Because there was no constitutional error, Neill has also failed to establish any cumulative error warranting habeas relief. *See, e.g., Clayton*, 199 F.3d at 1180.

## IV.     CONCLUSION

Having considered the record and the parties' arguments, we AFFIRM the denial of habeas relief.[8]

---

[8]     We also deny Neill's motion for a certificate of appealability, *see* 28 U.S.C. § 2253(c), on his claims challenging the trial court's admission of gruesome crime scene and autopsy photographs, and the jury's consulting a Bible during its deliberations. Neill has failed to show that either claim makes a "substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2); *see also, e.g., English v. Cody*, 241 F.3d 1279, 1281 (10th Cir. 2001).

00-6024, <u>Neill v. Gibson</u>

**LUCERO**, Circuit Judge, dissenting.

I appreciate the revisions made to the majority opinion in response to the petition for rehearing and my initial dissent. <u>See</u> <u>Neill v. Gibson</u>, 263 F.3d 1184, 1199 (10th Cir. 2001). While these changes bring us into closer accord,[1] I nevertheless am unable to conclude under <u>Darden v. Wainwright</u>, 477 U.S. 168 (1986), that petitioner received a fair sentencing-phase trial despite the prosecutor's direct request that the jury consider petitioner's homosexuality in its decision to impose the death penalty. The majority now finds fault with the prosecution's argument at the sentencing phase; labeling the argument "improper," the majority subjects the error to a balancing test and declines to correct it on appeal. Respectfully, I do not consider this a matter of propriety.

I begin my analysis with the recognition that petitioner stands, and by our decision today remains, convicted of murders of a most gruesome sort. Yet the level of

---

[1] The prior majority opinion rejected petitioner's claim that appellate counsel was ineffective for failing to challenge the prosecutor's comments about his homosexuality based on the majority's conclusion that the omitted claims were not "clearly meritorious." <u>Neill v. Gibson</u>, 263 F.3d 1184, 1195 n.5 (2001) (citing <u>Johnson v. Gibson</u>, 169 F.3d 1239, 1251 (10th Cir. 1999)). Although I concluded that the omitted claims were in fact clearly meritorious, I expressed "serious reservations" about whether application of the heightened "clearly meritorious," or "dead-bang winner," standard was in accord with the Supreme Court's decision in <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000). <u>See</u> <u>Neill</u>, 263 F.3d at 1199 n.1 (Lucero, J., dissenting). <u>Smith</u> held that the proper standard for reviewing claims of ineffective assistance of appellate counsel "is that enunciated in <u>Strickland v. Washington</u>," 466 U.S. 668 (1984). <u>Smith</u>, 528 U.S. at 285.
     Today, the en banc Court expressly repudiates the "dead-bang winner" standard for judging ineffective assistance of appellate counsel claims, and although the majority reaches the same result as before, its opinion has been revised to reflect this en banc determination.

repugnancy of a crime must not dictate the level of adherence to those constitutional principles that define a fair trial in this country. The majority's abstract reweighing of the trial evidence to determine whether the prosecutor's comments diminished the jury's ability to fairly consider the evidence allows it to conclude that there was no constitutional error, but unmentioned in its analysis is the reality that gays and lesbians are held in contempt by substantial numbers among us. This well-known prejudice presents the only rationale for the prosecutor's direct plea that the jury "disregard" Neill as a person and consider him instead "a vowed [sic] homosexual."

All criminal defendants are entitled to respect of the bedrock principles that define our system of justice—due process and equal protection of the laws. U.S. Const. amends. V, XIV; Bolling v. Sharpe, 347 U.S. 497, 499 (1954). While it has often been repeated that a fair trial does not mean a perfect trial, see Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986), at bottom, due process requires observance of fundamental fairness throughout the entire criminal process. Bracey v. Gramley, 520 U.S. 899, 904–05 (1997). Under our adversarial system—at the risk of the consequence of reversal—counsel are expected to know and respect these core values of equality and fairness. Although an inadvertent reference to a defendant's race, sexual orientation, or religion may not ordinarily merit more than a cautionary trial instruction, a blatant and direct plea—over objection—to render a life-or-death decision based on such bias is in direct contravention of this country's constitutional principles and cannot be ignored. We must draw the line

-2-

where the racial or sexual plea is blatant and direct, and we must resolutely resolve subject cases under that standard to assure that the line remains indelible. If by balancing the evidence against the challenged comments we allow the repugnancy of the crime to define the minimum standard of fairness of the adversary's sullied fray, we also allow an open appeal to prejudice to prevail. Because I am unwilling to so define equal justice or fairness, I respectfully dissent.

## I

As noted in the majority opinion, the state was not the first to bring Neill's sexual orientation to the jury's attention. During sentencing, petitioner made no attempt to hide the nature of his romantic relationship with Robert Grady Johnson, arguing that problems in the relationship contributed to his criminal activity. Addressing this mitigating factor in the closing argument, the prosecutor noted that petitioner was "a vowed [sic] homosexual. He had a gay lover he didn't want to lose." (V Trial Tr. at 1283.) The prosecutor continued, "Any of you ever been in a relationship that broke up? Did that justify or warrant you going out and killing four people and shooting three others? . . . The fact that you're losing a lover does not put you in the emotional state where it would justify this." (Id.) I do not take issue with the majority's disposition of these comments.

This first set of comments was followed a few pages later in the transcript by a second set:

> I'd like to go through some things and I'd like to do it in as generic a form
> as I can. If I could ask each of you to disregard Jay Neill and take him out

of the person but consider these things in a generic way. I want you to think briefly about the man you're setting [sic] in judgment on and determining what the appropriate punishment should be, and believe me, ladies and gentlemen, you have every thing [sic] in this case, the good, the bad, everything that the law allows to aid you in this decision. But just generic, just put in the back of your mind what if I was sitting in judgment on this person without relating it to Jay Neill, and I'd like to go through some things that to me depict the true person, what kind of person he is. He is a homosexual. The person you're sitting in judgment on—disregard Jay Neill. You're deciding life or death on a person that's a vowed [sic] homosexual.

MR. PEARSON [Defense counsel]: Excuse me, Your Honor. May we approach the bench, please?

THE COURT: You may.

MR. PEARSON: Your Honor, sexual preference is not an aggravating circumstance and we believe it improper for the prosecutor to argue that one of the factors the jury ought to consider in imposing the death penalty is a sexual preference of homosexuality.

MR. SCHULTE [Prosecutor]: I'm not doing that, Your Honor. I'm showing the make-up of this man. I'm gonna go through the deceptions that he has practiced over the preparation and the planning of this, his thought process, how he treated friends the reaction, he borrowed money from Rhonda Neff at the same time he was forging a check on her. This was stated from the outset. I've gone over the aggravating circumstances. I am not in any way tying this or alluding that it is one and I'll in fact tell the jury such.

THE COURT: Objection's overruled with exceptions to the defendant.

MR. SCHULTE [to jury]: . . . I don't want to import to you that a person's sexual preference is an aggravating circumstance. It is not. . . . But these are areas you consider whenever you determine the type of person you're setting [sic] in judgment on . . . .
The individual's homosexual. He's in love with Robert Grady Johnson. He'll do anything to keep his love, anything.

(Id. at 1285–87.) Defense counsel did not repeat his objection, and this issue of prosecutorial misconduct was not raised on direct appeal by defendant's appellate counsel.

## II

### A

This second set of comments, in which the prosecutor blatantly and directly—over objection—urges the jury to consider Neill's homosexuality in weighing the aggravating and mitigating evidence during his capital sentencing proceeding, speaks for itself. It is not responsive to petitioner's mitigation claim that he "was suffering extreme mental and emotional disturbances with regard to his relationship with [Johnson] which affected his mental thought processes." (II Original R. at 138.) The majority agrees that the comments constituted error. (Revised Majority Op. at 25 ("There does not appear to be any legitimate justification for these remarks. They are improper.").)

But what is it that makes the comments more than merely improper? As prosecutors know, gays and lesbians are routinely subject to invidious bias in all corners of society. See Richard A. Posner, Sex and Reason 291 (1992) ("The history of social policy toward homosexuals in Western culture since Christ is one of strong disapproval, frequent ostracism, social and legal discrimination, and at times ferocious punishment."); David A. J. Richards, Women, Gays, and the Constitution 296–97 (1998). This contempt is acknowledged—writ large, as it were—in the Supreme Court's decision in Bowers v.

Hardwick, 478 U.S. 186, 190 (1986) (holding that the Constitution does not "confer[] a fundamental right upon homosexuals to engage in sodomy"), in which Chief Justice Burger underscored:

> Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization. Condemnation of those practices is firmly rooted in Judeo-Christian moral and ethical standards. . . . Blackstone described "the infamous crime against nature" as an offense of "deeper malignity" than rape, a heinous act "the very mention of which is a disgrace to human nature," and "a crime not fit to be named." . . . To hold that the act of homosexual sodomy is somehow protected as a fundamental right would be to cast aside millennia of moral teaching.

478 U.S. at 196–97 (Burger, C.J., concurring) (citations omitted). Although gays and lesbians face increasing acceptance in our culture,[2] in the eyes of many, "gay people remain second-class citizens." William N. Eskridge, Jr., Gaylaw: Challenging the Apartheid of the Closet 139 (1999). Today, almost half of all Americans continue to think that homosexuality should not be considered an acceptable lifestyle. Frank Newport, Gallup Org., American Attitudes Toward Homosexuality Continue to Become More Tolerant, at http://www.gallup.com/poll/releases/pr010604.asp (June 4, 2001). According to the Federal Bureau of Investigation, there were 1534 reported victims of hate crimes motivated by anti-homosexual bias in 2000. Unif. Crime Reporting Program, Fed. Bureau of Investigation, Hate Crime Statistics 2000 7 tbl.1 (2001).

---

[2] See, e.g., Gay Children Need Support, Bishops Urge, N.Y. Times, Oct. 1, 1997, at A14; Gustav Niebuhr, Reform Rabbis Back Blessing of Gay Unions, N.Y. Times, Mar. 30, 2000, at A1.

The openly gay defendant thus finds himself at a disadvantage from the outset of his prosecution. When a prosecutor directs the jury to make its guilt-innocence or life-death determination on the basis of anti-homosexual bias, that disadvantage is magnified exponentially and raises constitutional concerns. This is so because prosecutors occupy a position of trust,[3] and their exhortations carry significant weight with juries. As the Supreme Court has said,

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935). For this reason courts have overturned convictions when prosecutors have made statements highlighting sexual orientation or race in clear attempts to manipulate the prejudices of the jury. See United States v.

---

[3] In the seminal case of Berger v. United States, 295 U.S. 78, 88 (1935), the Court stated that the prosecutor

> is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

The Oklahoma Rules of Professional Conduct are in accord: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." Okla. Rules of Prof'l Conduct R. 3.8 cmt. 1.

<u>Birrell</u>, 421 F.2d 665, 666 (9th Cir. 1970) (per curiam) (reversing conviction because prosecutor's comments "invited conviction irrespective of innocence of the crime charged, upon the ground that appellant was a homosexual"); <u>United States v. Doe</u>, 903 F.2d 16, 24–28 (D.C. Cir. 1990) (reversing conviction for racially inflammatory remarks during summation); <u>Miller v. North Carolina</u>, 583 F.2d 701, 704, 706–08 (4th Cir. 1978) (same); <u>United States ex rel. Haynes v. McKendrick</u>, 481 F.2d 152, 154–61 (2d Cir. 1973) (same). Our decision today thus creates a circuit split.[4]

The importance of the jury's impartiality and the prosecutor's conduct is especially pronounced in capital sentencing proceedings, where the interplay between the

---

[4]     Direct remarks asking jurors to take race or sexual orientation into account in their deliberations are distinguishable from comments that are relevant to the evidence and limited to that purpose. For example, in <u>Strouse v. Leonardo</u>, 928 F.2d 548 (2d Cir. 1991), the prosecutor asked the defendant, who was on trial for murdering his mother, "Did your mother also argue with you about the fact that you had homosexual men sleep over your [sic] apartment?" <u>Id.</u> at 557 (brackets omitted). In addition, the prosecutor referred to defendant's homosexuality during summation. The Second Circuit concluded that the prosecutor's "remarks appear to have been limited to demonstrating tension between Strouse and his mother," and thus, "the cumulative effect of the prosecutor's alleged misconduct was not so severe as to amount to the denial of a fair trial." <u>Id.</u>

In two of this Court's decisions, <u>United States v. Abello-Silva</u>, 948 F.2d 1168 (10th Cir. 1991), and <u>United States v. Soto</u>, 988 F.2d 1548 (10th Cir. 1993), we concluded that specific prosecutorial remarks did not render a trial fundamentally unfair because there was abundant evidence supporting guilt and "the prosecutor did not use ethnicity or nationality in an attempt to manipulate the jury." <u>Soto</u>, 988 F.2d at 1559–60; see also <u>Abello-Silva</u>, 948 F.2d at 1182 ("Having read both closing arguments in their entirety, we conclude ethnicity or nationality was not used to manipulate the prejudices of the jury.").

In neither <u>Strouse</u>, <u>Abello-Silva</u>, nor <u>Soto</u> was there a direct appeal made to the jury that it consider the defendant's sexual orientation, race, or nationality in deciding the case. These cases are therefore fundamentally different from the present challenge.

jury and the state has added significance. In <u>Gregg v. Georgia</u>, 428 U.S. 153, 192 (1976),

Justices Stewart, Powell, and Stevens, announcing the judgment of the Court, addressed

the concern that a capital jury may not be sophisticated enough to consider the imposition

of the death penalty. The Justices stated, "It seems clear, that the problem will be

alleviated if the jury is given guidance regarding the factors about the crime and the

defendant that the State, representing organized society, deems particularly relevant to the

sentencing decision." <u>Id.</u>

Reason—not caprice or emotion—controls in capital sentencing proceedings. In

<u>Gardner v. Florida</u>, 430 U.S. 349 (1977), the Supreme Court explained the underlying

rationale:

> From the point of view of the defendant, [the death penalty] is different in
> both its severity and its finality. From the point of view of society, the
> action of the sovereign in taking the life of one of its citizens also differs
> dramatically from any other legitimate state action. <u>It is of vital importance
> to the defendant and to the community that any decision to impose the death
> penalty be, and appear to be, based on reason rather than caprice or
> emotion.</u>

<u>Id.</u> at 357–58 (emphasis added).[5] For these reasons, our analysis of constitutional

challenges at the capital sentencing stage proceeds with great care, effort, and attention.

---

[5] See also <u>Simmons v. South Carolina</u>, 512 U.S. 154, 172 (1994) (Souter, J.,
concurring) (stating that a capital defendant is entitled to a "jury capable of a reasoned
moral judgment about whether death, rather than some lesser sentence, ought to be
imposed"); <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976) (plurality) ("Because
of the qualitative difference, there is a corresponding difference in the need for reliability
in the determination that death is the appropriate punishment in a specific case.").

See Beck v. Alabama, 447 U.S. 625, 638 (1980) ("To insure that the death penalty is indeed imposed on the basis of 'reason rather than caprice or emotion,' [the Supreme Court has] invalidated procedural rules that tended to diminish the reliability of the sentencing determination." (quoting Gardner, 430 U.S. at 358)); Caldwell v. Mississippi, 472 U.S. 320, 329 (1985) ("Accordingly, many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion.").

The prosecutor's precise words are so powerful that they bear repeating:

> I want you to think briefly about the man you're setting [sic] in judgment on and determining what the appropriate punishment should be . . . . [J]ust put in the back of your mind what if I was sitting in judgment on this person without relating it to Jay Neill, and I'd like to go through some things that to me depict the true person, what kind of person he is. He is a homosexual. The person you're sitting in judgment on—disregard Jay Neill. You're deciding life or death on a person that's a vowed [sic] homosexual.

(V Trial Tr. at 1285–86.) The majority's observation that "[t]here does not appear to be any legitimate justification for these remarks," understates the matter. (Revised Majority Op. at 25.) Justification for these remarks was unquestionably illegitimate. Exploiting his position of trust and spinning the reality of anti-gay prejudice to a pivotal position in the capital-sentencing phase, the prosecutor undermined the possibility that petitioner's sentence would be based on reason rather than emotion. With this understanding, I proceed to analyze whether petitioner's due process rights were violated in the context of the entire proceedings.

-10-

**B**

In analyzing prosecutorial misconduct claims, "it is not enough that the prosecutor['s] remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (quotation omitted). Although federal courts do not "hold[] every improper and unfair argument of a state prosecutor to be a federal due process violation, [the cases do] not insulate all prosecutorial comments from federal constitutional objections." Caldwell, 472 U.S. at 338. In this Circuit, we have expressed our duty to "view the prosecutor's statements in context" and have held that "we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotation omitted) (emphasis added). "Ultimately, we must consider the probable effect the prosecutor's [statements] would have on the jury's ability to judge the evidence fairly." Id.; see also Rojem v. Gibson, 245 F.3d 1130, 1142 (10th Cir. 2001) (same); Tillman v. Cook, 215 F.3d 1116, 1129 (10th Cir.) (same), cert. denied, 531 U.S. 1055 (2000).

According to the Supreme Court, the relevant question is "whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). In Darden, petitioner challenged prosecutorial comments made during the guilt-innocence phase of his trial for capital murder. The

-11-

Court considered the following factors instructive: (1) whether the weight of evidence going to guilt was heavy, (2) whether the state manipulated or misstated evidence, (3) whether the state's remarks were invited by or responsive to the defense, (4) whether the trial court issued a curative jury instruction, and (5) whether defense counsel was able to cast the state's comments and actions "in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner." Id. at 182. Concluding that each of these factors weighed against Darden's prosecutorial misconduct claim, the Court affirmed the denial of habeas relief. Id.

I examine the Darden factors.

1. Could the prosecutor's statements plausibly have tipped the scales in favor of the death penalty in light of the strength of the evidence against defendant?

Yes. Under our precedent, we first look to the strength of the evidence to "decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." Fero, 39 F.3d at 1474 (quotation omitted) (emphasis added). As the majority explains, the evidence of petitioner's guilt was strong:

> The State's evidence, which was largely undisputed, overwhelmingly established that, during a bank robbery, Neill stabbed three bank employees to death, including one woman who was seven months pregnant. Neill also attempted to decapitate each woman with a knife. He forced the five customers who entered the bank during the robbery to lie face down in the back room where he had stabbed the bank employees. Neill then shot four customers in the head, killing one and wounding three others, and attempted to shoot the fifth, an eighteen-month-old child. Afterwards, Neill flew to San Francisco with Johnson, where they spent the stolen money on expensive jewelry and clothing, hotels, limousines and cocaine. Except for

-12-

trying to shoot the child, Neill admits committing these crimes. In addition to overwhelmingly establishing Neill's guilt, this evidence also fully supports the three charged aggravating factors: Neill created a great risk of death to more than one person; he committed these murders to avoid arrest and prosecution for the bank robbery; and the murders were especially heinous, atrocious or cruel.

(Revised Majority Op. at 26.) Petitioner presented mitigating evidence, which the majority also summarizes:

He admitted committing these crimes, with the exception of trying to shoot the child, and he expressed his remorse. In addition, Neill testified at sentencing concerning his background, including his childhood medical problems, his physically abusive father and stepfather, Neill's newly found Christian faith, his relationship with Johnson, and Neill's hope that his testifying would facilitate his and the victims' healing. He also assured jurors that he would not pursue any appeals if they sentenced him to life without parole instead of death. Neill further testified that he had corresponded with one of the injured victims, who had forgiven him. And Pamela Matthews, who was the first person in the bank after the robbery and who discovered the victims, also testified concerning Neill's communications with her, his remorse, and her forgiving him.

(Id. at 26–27.) Concentrating on this Darden factor, and overlooking the remaining factors, the majority concludes, "[I]n light of the overwhelming evidence supporting Neill's guilt and the charged aggravating factors, weighed against this mitigating evidence, we cannot say that the prosecutor's improper comments influenced the jury's verdict or otherwise rendered the capital sentencing proceeding fundamentally unfair." (Id. at 27.) According to the majority, it "cannot say that [the prosecutor's remarks] tipped the scales of justice in the State's favor or precluded jurors from considering the evidence fairly." (Id. at 26.)

-13-

I find this analysis deficient for several reasons. Most importantly, it ignores the qualitative difference between the guilt-innocence and capital-sentencing stages of trial, a distinction acknowledged in Darden itself. See Darden, 477 U.S. at 183 n.15 ("In this case, the comments were made at the guilt-innocence stage of trial, greatly reducing the chance that they had any effect at all on sentencing."); Caldwell, 472 U.S. at 329 (stating that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." (quoting California v. Ramos, 463 U.S. 992, 998–99 (1983))). During the guilt-innocence phase, the jury's task was straightforward. If the state proved its case beyond a reasonable doubt, the jury was to find petitioner guilty.[6] In sentencing, however, the jury was merely authorized, and not required, to sentence petitioner to death even if the aggravating evidence was overwhelming. The jury was instructed:

> Should you unanimously find that one or more aggravating circumstances exist beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.

(II Original R. at 135.) This instruction was in accord with Oklahoma's statutory sentencing scheme, see Okla. Stat. Ann. tit. 21, § 701.11, and Oklahoma Court of Criminal Appeals cases, which have "repeatedly held that [it] will not establish specific standards for the balancing of aggravating and mitigating circumstances." Hamilton v.

---

[6]   The Jury was instructed: "The Defendant is presumed innocent of the crimes and the presumption continues unless after consideration of all the evidence you are convinced of his guilt beyond a reasonable doubt." (II Original R. at 166 (Jury Instruction No. 2).)

-14-

<u>State</u>, 937 P.2d 1001, 1011 (Okla. Crim. App. 1997) (citation omitted);[7] <u>Duckett v. State</u>, 919 P.2d 7, 23 (Okla. Crim. App. 1995) ("[T]his Court has held that the burden of proof analysis is not strictly applicable to the weighing process."). Like other states, Oklahoma has "plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute." <u>Gregg</u>, 428 U.S. at 222 (Opinion of White, J.).[8] As a result, the "weight of the evidence" analysis is not as straightforward as it may appear at first blush.

In weighing the strength of the evidence, the proper inquiry under our precedent is not whether, as the majority requires, the prosecutor's comments actually tipped the scales in the state's favor, but whether they "<u>plausibly</u> could have tipped the scales in favor of the prosecution." <u>Fero</u>, 39 F.3d at 1474 (quotation omitted) (emphasis added). Utilizing plausibility as the central inquiry, the alternative proposition—that the prosecutor's comments tipped the scales in favor of the prosecution—is a reasonable one, especially given that a death penalty assessment requires unanimous juror approval.

---

[7] A separate holding in <u>Hamilton</u> was overruled in <u>Alverson v. State</u>, 983 P.2d 498, 521 n.109 (Okla. Crim. App. 1999).

[8] Death is never compelled. Earlier this year, for example, the federal jury empaneled in <u>United States v. Bin Laden</u>, No. S(7)98 CR.1023(LBS) (S.D.N.Y.), rejected the death sentence for Mohamed Rashed Daoud Al-'Owhali, who was convicted for the killing of 213 people with a truck bomb at the United States Embassy in Nairobi, Kenya. Mark Hamblett, <u>Jury Rejects Death Penalty for U.S. Embassy Bomber</u>, N.Y.L.J., June 13, 2001, at 1. Similarly, the jury was unable to reach a unanimous verdict of death in the prosecution of Terry Nichols for his role in bombing a federal building in Oklahoma City that resulted in 168 deaths. <u>See</u> <u>United States v. Nichols</u>, 169 F.3d 1255 (10th Cir. 1999) (affirming life sentence).

Okla. Stat. Ann. tit. 21, § 701.11; Abshier v. State, 28 P.3d 579, 608 (Okla. Crim. App. 2001) ("The class of persons eligible to receive a punishment of death is further narrowed in Oklahoma by the restriction that . . . only a unanimous 12 member jury of the defendant's peers can set punishment at death."); see also Hooks v. State, 19 P.3d 294, 316 (Okla. Crim. App. 2001).

There is also the fact that the prosecutor's second set of comments unambiguously directed the jury to consider petitioner's homosexuality in imposing a life or death sentence. In Caldwell, the Supreme Court made the distinction between remarks that are "quite focused, unambiguous, and strong" and those that are "admittedly . . . ambiguous." 472 U.S. at 339–40. The challenged comments in this case fit into the former category and thus weigh heavily in my due process analysis.

I conclude that the evidence, while admittedly strong as to guilt, is not dispositive as to sentencing, particularly given the nature of the challenged prosecutorial comments and the setting in which they were made. I proceed to consider the remaining factors disregarded by the majority.

2.      Did the state improperly manipulate the evidence?

Yes. As stated above, supra Part II.A, the challenged prosecutorial comments manipulated the fact of petitioner's homosexuality to the state's advantage. The state now seeks, however, to diminish the impropriety of the remarks by claiming that "sexual orientation was relevant to the issues in the case because it was the problems arising from

-16-

the relationship with Johnson that provided the motivation for the robbery and murders."

(Appellee's Br. at 42.)  I agree with the majority that the second set of comments is in no

way responsive to petitioner's claim that he "was suffering extreme mental and emotional

disturbances with regard to his relationship with [Johnson] which affected his mental

thought processes."  (II Original R. at 138.)  I also agree with the majority that the

argument was improper.  My only disagreement is that I consider the error to be of a

greater degree.

Admittedly, this would be a different case if the prosecutor's remarks had been

limited to his first set of comments, in which he argued that "losing a lover does not put

you in the emotional state where it would justify this."  (V Trial Tr. at 1283.)   Those

comments are responsive to petitioner's mitigation evidence and not a direct invocation of

anti-homosexual bias.

3.      Were the prosecutor's comments invited or responsive?

No.  "[T]he idea of 'invited response' is used not to excuse improper comments,

but to determine their effect on the trial as a whole."  Darden, 477 U.S. at 182. This factor

highlights a critical point in this case.  As in my earlier dissent, I reject the proposition

that the subject remarks were harmless because the defendant brought up the fact of his

homosexuality and gay relationship.  Under "he brought it up" reasoning, a direct appeal

to a jury that it consider a defendant's race would be permissible if a defendant

introduced evidence of his ethnicity—or that of a partner—or if it was otherwise apparent

-17-

that a defendant belonged to a particular minority group; and an appeal to consider a defendant's religion would be permissible if the defendant introduced relevant testimony about his religious persuasion—or that of a partner—or if it was otherwise apparent. To accept the "he brought it up" justification for the prosecutor's comments would chill the rights of any minority defendant or any defendant in an inter-racial, inter-ethnic, inter-religious, or homosexual relationship.

Although the prosecutor's first set of comments were responsive to petitioner's mitigation argument that the stress of his relationship impacted his mental thought processes, the second comments were not. No convolution can twist the facts of this case into invited error under this factor.

4.    Did the district court issue a curative instruction?

No. Remarkably, there was no curative instruction. To the contrary, no effort was made by the trial court to neutralize the remarks. The trial court's overruling of defense counsel's objection effectively stamped an imprimatur of approval on the prosecution's comments, leaving the jury with the impression that it was acceptable to consider the fact of defendant's homosexuality in determining whether to sentence him to life or death.

5.    Was defense counsel able to cast the prosecutor's comments in a light likely to neutralize them?

No. Defense counsel was not able to cast the prosecutor's comments "in a light that was more likely to engender strong disapproval than result in inflamed passions

-18-

against petitioner." Darden, 477 U.S. at 182. Given the trial court's refusal to correct the subject error, defense counsel had no alternative but to sit on his hands.

## C

Based on the foregoing analysis, which includes consideration of the four Darden factors unaddressed by the majority, I conclude that the prosecutor's comments limited the jury's ability to make an impartial decision regarding Neill's sentence, which is what our precedent requires me to determine. See Rojem, 245 F.3d at 1143 ("Ultimately, we consider the probable effect the prosecutor's remarks had on the jury's ability to judge the evidence fairly."). In the face of such a blatant due process violation, the Oklahoma Court of Criminal Appeals' decision that Neill's appellate counsel was not ineffective in failing to challenge the violation is an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). Neill's appellate counsel was deficient in failing to raise this prosecutorial misconduct claim, and Neill was prejudiced by this deficient performance. To my mind, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

## III

My confidence in petitioner's sentence is further undermined by the likelihood that he was denied an impartial jury due to the failure of both the court and his trial counsel to inquire on voir dire whether three members of the jury were predisposed to impose the

death penalty. Neill proffers affidavits prepared by the Oklahoma Indigent Defender System ("OIDS") reporting statements made by two of the jurors, Rusella Loggins and Glen Nelson Hyde, III, during interviews with OIDS investigators. Loggins told an investigator that she believed death was the only appropriate punishment for murder under any circumstances. Hyde, the jury foreman, told another investigator that when a person takes a life, he or she deserves the same sentence. Neill also points to a third juror's voir dire response in which he stated that he would "like" to impose a death sentence. (II Trial Tr. at 471.)

I agree with the majority that we are constrained to review Neill's biased jury claim through the lens of ineffective assistance of counsel. Such claims are evaluated under the familiar two-pronged approach of Strickland, 466 U.S. at 687. Under that analysis, Neill must show his "counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different." Nguyen v. Reynolds, 131 F.3d 1340, 1347 (10th Cir. 1997) (citing Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)). "[C]ounsel's actions during voir dire are presumed to be matters of trial strategy." Fox v. Ward, 200 F.3d 1286, 1295 (10th Cir. 2000). Consequently, claims of ineffective assistance of counsel at voir dire cannot succeed "unless counsel's decision is shown to be so ill chosen that it permeates the entire trial with obvious unfairness." Nguyen, 131 F.3d at 1349.

Against that background is the requirement that persons the state wishes to execute be convicted and sentenced by impartial juries. In particular, the Supreme Court held in Morgan v. Illinois, 504 U.S. 719, 729 (1992), that "a capital defendant may challenge for cause any prospective juror who [will automatically impose the death penalty]. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." Further, the Court noted that although "[t]he Constitution . . . does not dictate a catechism for voir dire, . . . part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Id. (citations omitted). We have echoed the Court's concern about adequate voir dire in death penalty cases. United States v. Chanthadara, 230 F.3d 1237, 1269 (10th Cir. 2000) ("[B]ecause the jurors are vested with greater discretion in capital cases, the examination of prospective jurors must be more careful than in non-capital cases."); Hale v. Gibson, 227 F.3d 1298, 1318 (10th Cir. 2000) ("[D]ue process requires a voir dire examination of a potential juror's views on the death penalty."). I read Morgan, Chanthadara, and Hale as not only permitting, at a party's request, a thorough voir dire of potential jurors' views of the death penalty, but actually requiring that such questioning take place as a matter of due process.

Neill's counsel's performance was deficient based on the requirement of an adequate voir dire. Despite receiving a response that indicated that Juror Hannabass "would like to" sentence Neill to death, "[n]either defense counsel nor anyone else further

-21-

questioned this juror concerning his ability to consider imposing a sentence less than death." (Revised Majority Op. at 16.) This deficiency was exacerbated by the fact that the entire trial revolved around the penalty phase. Neill's trial counsel basically conceded guilt (a reasonable decision considering the overwhelming evidence against Neill). That situation should have made Neill's counsel especially vigilant concerning jurors' attitudes about the death penalty as it was certain that they would be called upon to decide whether death was the appropriate punishment. Under those circumstances, failing to ask jurors their views on the death penalty could not have been a viable strategy.

In addition, I question the majority's contention that "the record is insufficient to permit this court to determine whether defense counsel's failure to ask only these three jurors whether they would automatically vote for a death sentence was strategic." (Id.. at 13-14.) To the contrary, the record in this case clearly indicates that it was counsel's strategy to question jurors about their views on the death penalty. In letters to Neill, his counsel stated that he would "concentrate" on voir dire (Post-Conviction Application App. E at 4) and that he was aware of Morgan and would "just ask enough [at voir dire] to preserve error for review" (id. at 14). In addition, someone, "either defense counsel or the prosecutor[,] asked all . . . prospective jurors" other than the three who are the subjects of the proffered affidavits "whether they would consider imposing a sentence less than death." (Revised Majority Op. at 13.) The unexplained failure to question these

-22-

jurors—which flies in the face of everything in the record—can be viewed as nothing other than objectively deficient performance by Neill's counsel.

As for the prejudice prong, the majority concludes that the proffered affidavits are too conclusory to merit habeas relief. While I agree that standing alone the affidavits do not merit vacating Neill's sentence,[9] when combined with the prosecutor's homophobic remarks, they further undermine confidence in the jury's verdict and lend additional support to my conclusion that Neill's death sentence cannot stand.

**IV**

I understand the temptation lawyers may have to read our ultimate holding—affirm or reverse—first and the Court's analysis second. The message of this case will then be unavoidable. Bottom line: The prosecutor got away with conduct that the majority labels "improper" and that I consider outrageous and overwhelmingly prejudicial. I consider the

---

[9]     Even considered in isolation, the affidavits do raise sufficiently serious allegations to require an evidentiary hearing. Neill "is entitled to an evidentiary hearing 'if his allegations, if true and not contravened by the record,' entitle him to habeas relief." Walker v. Gibson, 228 F.3d 1217, 1231 (10th Cir. 2000) (quoting Mayes v. Gibson, 210 F.3d 1284, 1287 (10th Cir. 2000)). Neill meets that standard: the Supreme Court has held that "[i]f even one such [biased] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." Morgan, 504 U.S. at 729 (emphasis added). In this case, the deficient performance of Neill's trial counsel potentially permitted three biased jurors to sit on the jury that imposed his death sentence. An evidentiary hearing would address the majority's concerns with the shortcomings of Neill's affidavits. To avoid hearsay problems the jurors themselves could be called to testify. Full questioning would "provid[e] the context in which these jurors made the[] statements [in their affidavits]" and would supply "the time frame during which they . . . held these beliefs." (Revised Majority Op. at 15.) Such a hearing is not necessary, in my view, because Neill is entitled to resentencing outright based on his prosecutorial misconduct claim.

error before us to be of a magnitude that "seriously affect[s] the fairness, integrity, [and] public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732 (1993) (quotation omitted).  The precedent for future cases is disturbing.

All litigants—prosecution and defense alike—have committed to a higher calling. As lawyers we pledge to defend and support the American constitutional values that define fairness and equal justice for all defendants.  Because the prosecutor was deficient under Darden in having implored the jury to violate these tenets, and because petitioner's appellate counsel was deficient under Strickland in failing to challenge the prosecutor's comments on appeal, I would grant habeas relief as to the sentencing phase of trial and remand the case for re-sentencing.  Finding no constitutional error in the guilt phase of the trial, I would not disturb the conviction of guilt.